[Crim. No. 12226. In Bank. Jan. 27, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
BARRY FLOYD and JOHNNY MILTON, Defendants and Appellants.

**COUNSEL**

Emmet Hagerty and David A. Binder, under appointments by the Supreme Court, Meyer S. Levitt, Jared R. B. Hutton and Rodney Moss for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kallay, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**BURKE, J.**—A jury found Barry Floyd and Johnny Milton guilty of first degree robbery (Pen. Code, § 211) and first degree murder (Pen Code, § 187) and sentenced them to death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

On January 10, 1967, about 1 p.m., a Los Angeles Rapid Transit District busdriver, named Hartzel, was robbed, shot and killed by two male passengers. Two other passengers identified Floyd and one passenger identified Milton as the robbers; Floyd was identified as the triggerman. An eyewitness outside the bus observed Floyd and Milton fleeing; he identified Milton as one of those fleeing the bus.

A fingerprint of Floyd was found on the bus. Miscellaneous change, but no currency, was found on and near the bus. Twenty-one one-dollar bills, folded individually, and a numbered transfer from the busdriver's transfer book were found in Floyd's shirt when he was arrested on the day of the robbery. Thirty one-dollar bills and a five-dollar bill, folded individually, were found in Milton's pants pocket after he was arrested on the day of the robbery. A later search, authorized by warrant, of the apartment at which Milton and Floyd were arrested yielded a gun, which, according to expert ballistics testimony, was the murder weapon, and a numbered transfer, one number lower than the transfer found on Floyd and also from the busdriver's transfer book. Both the gun and the transfer were found in the same place in the apartment.

Floyd did not testify at either the guilt or penalty trials. Milton testified at both trials. Milton's defense was that of alibi; he testified that he had been at his half-brother's apartment (where he and Floyd were arrested) since 11 or 11:30 a.m.; his testimony was corroborated by testimony of his half-brother, a woman who had been the common law wife of his half-brother, and his younger sister.

### Right to Counsel

Milton contends that he was denied his right to represent himself, or, in the alternative, denied his right to effective counsel because the trial court refused to appoint another attorney despite defendant's demands for another attorney. Neither contention has merit.

A "defendant in a criminal case has the constitutional right to waive counsel and represent himself if he knowingly and intelligently elects to do so. [Citations.]" (E.g., *People* v. *Maddox,* 67 Cal.2d 647, 651 [63 Cal.Rptr. 371, 433 P.2d 163].) However, the decision whether the defendant is capable of making a knowing and intelligent election is a dis-

cretionary matter, which, absent a showing of abuse, will not be disturbed on appeal. (*People* v. *Carter,* 66 Cal.2d 666, 672 [58 Cal.Rptr. 614, 427 P.2d 214]; *People* v. *Shroyer,* 203 Cal.App.2d 478, 482-483 [21 Cal. Rptr. 460].)

 Although the defendant's right to represent himself cannot be denied simply because he is unable to "demonstrate either the acumen or the learning of a skilled lawyer" (*People* v. *Harmon,* 54 Cal.2d 9, 15 [4 Cal.Rptr. 161, 351 P.2d 329]; *People* v. *Linden,* 52 Cal.2d 1, 18 [338 P.2d 397]; see also, *People* v. *Addison,* 256 Cal.App.2d 18, 24 [63 Cal. Rptr. 626]), a defendant may waive counsel and choose to represent himself only if the defendant has an intelligent conception of the consequences of his act (*People* v. *Carter, supra,* 66 Cal.2d 666, 670) and understands the nature of the offense, the available pleas and defenses, and the possible punishments (*In re Johnson,* 62 Cal.2d 325, 335 [42 Cal.Rptr. 228, 398 P.2d 420]).

 Milton contends that the questions asked by the trial court, in response to his request to represent himself, and the court's refusal to allow him to do so violated the rule that a defendant need not have the knowledge or learning of an attorney.

The particular questions quoted by Milton, without more, may not have justified denying him his right to represent himself. But the questions cannot be isolated from the answers, nor from other factors of which the court was aware.[1]

---

[1]The court asked Milton: "How many peremptory challenges do you have in the selection of a jury?

"THE DEFENDANT: Well, all I can say is I just select to the best of my ability.

"THE COURT: The question is, do you know how many peremptory challenges you have?

"THE DEFENDANT: I would find out.

"THE COURT: . . . How many exceptions are there to the hearsay rule as to the admissibility of evidence?

"THE DEFENDANT: Beg pardon.

"THE COURT: How many exceptions are there in the New Evidence Code as to evidence as to the hearsay rule?

"THE DEFENDANT: I don't know.

" . . . . . . . . . . .

"THE COURT: Under what circumstances can a confession be admitted?

"THE DEFENDANT: I don't know anything about that."

The court then denied defendant's request to represent himself.

It is true that the questions asked by the trial court turned on technicalities that possibly not all lawyers would know without research, such as the number of peremptory challenges and the exact number of exceptions to the hearsay rule. To this extent, the instant case is similar to *People* v. *Addison, supra,* 256 Cal.App.2d 18, which involved similar questions (*id.,* at p. 21), and in which the court held that the defendant had been improperly denied the right to represent himself (*id.,* at p. 25). *Addison* is, however, distinguishable, not on the questions asked but on the responses given.

The record makes clear that by May 22, when the motion was made, the court had adequate opportunity to observe and listen to Milton, and adequate grounds to decide that he could not intelligently waive the right to counsel nor represent himself.

First, the charges against Milton were serious, murder and robbery, with the prosecution seeking the death penalty. Second, the court had been requested to appoint a psychiatrist to examine Milton, and a plea of not guilty by reason of insanity, although later withdrawn, had been entered. Third, Milton was only 21 years of age at the time of trial, had no prior adult record of convictions, and had a 10th or 11th grade education.

Moreover, Milton's conduct in court after the court denied his motion to proceed in propria persona makes clear that he was incapable of defending himself. Had a defendant like Milton represented himself in a death penalty case, this court would have been required to reverse any conviction resulting from those proceedings, based on a fundamental denial of due process. There was no error in refusing to allow Milton to represent himself.

■ Milton contends that because of an alleged conflict between himself and his court-appointed counsel, he was entitled to have another attorney appointed.[2] ■ "[T]here is no constitutional right to an attorney who will conduct the defense of the case in accordance with an indigent defendant's whims." *(People* v. *Nailor,* 240 Cal.App.2d 489, 494 [49 Cal.Rptr. 616], cert. den., 385 U.S. 1030 [17 L.Ed.2d 678, 87 S.Ct. 763]; see also *People* v. *Mattson,* 51 Cal.2d 777, 793 [336 P.2d 937]; *In re Atchley,* 48 Cal.2d 408, 418-419 [310 P.2d 15]; *In re Luna,* 257 Cal. App.2d 754, 757 [65 Cal.Rptr. 121].) ■ Further, it is well established that an attorney representing a criminal defendant has the power to control the court proceedings. (See *People* v. *Hill,* 67 Cal.2d 105, 114-115 [60 Cal.Rptr. 234, 429 P.2d 586], cert. den. 389 U.S. 1009 [19 L.Ed.2d 607, 88 S.Ct. 572]; *People* v. *Foster,* 67 Cal.2d 604, 606 [63 Cal.Rptr. 288, 432 P.2d 976]; *People* v. *Darling,* 58 Cal.2d 15, 19 [22 Cal.Rptr. 484, 372 P.2d 316]; *People* v. *Mattson, supra,* 51 Cal.2d 777, 789; *People* v. *Merkouris,* 46 Cal.2d 540, 554-555 [297 P.2d 999].)

■ Milton's reliance on *People* v. *Moss,* 253 Cal.App.2d 248, 250 [61 Cal.Rptr. 107], in which the defendant and his court-appointed

---

For example, the defendant in *Addison* understood the nature of hearsay, while Milton appears not to have understood the concept at all. Similarly, Milton appears not to have understood the process of *voir dire.* Finally, he admitted that he knew nothing about the admissibility of confessions, a matter that was to be very much in issue.

[2]Floyd was represented by the public defender. Because of a conflict in representing both Floyd and Milton, the court appointed separate counsel to represent Milton.

attorney had reached an "impasse on a crucial issue" is misplaced. The court in *Moss* stated: "We believe the basic right to representation by counsel . . . encompasses the right to the appointment of different counsel when a legitimate difference of opinion develops between a defendant and his appointed counsel as to a fundamental trial tactic." (*Id.*, at p. 251.) We need not decide whether the rule proposed in *Moss* correctly states the law as to right to counsel (see *People* v. *Maddox, supra,* 67 Cal.2d 647, 654, fn. 2), since Milton's repeated requests that a different attorney be appointed were premised on a lack of confidence in his appointed counsel not on a disagreement as to trial tactics.

The record makes crystal clear that the only substantial "conflict" between Milton and his attorney was that Milton refused to cooperate in order to permit his attorney to prepare a defense consistent with a not guilty plea.

### CHANGE OF VENUE

Both Floyd and Milton contend that the trial court's refusal to grant a change of venue deprived them of due process, because defendants were tried "in a county inflamed with passion and prejudice against individuals accused of the type of crimes charged . . . ." The contention is based solely on public concern for and publicity concerning "the increasing number of crimes being committed in the South Central part of the City against persons involved in various service industries."

"A motion for change of venue . . . shall be granted whenever it is determined that because of the dissemination of potentionally prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had." (*Maine* v. *Superior Court,* 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372].) Crime is always a matter for public concern, and if the fact that the public has expressed concern as to a rising crime rate or certain classes of crime meant that a fair trial could not be had, it is doubtful whether a fair trial could ever be had. Such general concerns are in large part balanced by the community's desire to convict the true wrongdoer and acquit the innocent, and the general concern to reduce crime and apprehend criminals does not furnish the basis for a change of venue.

In all of the cases on which defendants rely, the determination that a fair trial could not be had was based on a showing of prejudice against the particular defendant or defendants. (*Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 339-342 [16 L.Ed.2d 600, 606-608, 86 S.Ct. 1507]; *Maine* v. *Superior Court, supra,* 68 Cal.2d 375, 385-386; *People* v. *McKay,* 37 Cal.2d 792, 794 [236 P.2d 145]; *People* v. *Suesser,* 132 Cal. 631, 633-634 [64 P. 1095]; *People* v. *Yoakum,* 53 Cal. 566, 569-570; *People* v. *Lee,* 5 Cal. 353, 354.) Defendants, however, cite no pub-

licity whatsoever concerning their crime, or arrest, or trial; they concede that only two jurors had even heard of the crime involving Floyd and Milton.

## RIGHT TO SPEEDY TRIAL

██ Floyd and Milton claim that they were deprived of their right to a speedy trial, as guaranteed by the United States and California Constitutions. The contention is without merit.

Defendants were arrested on January 10, 1967, for the robbery and murder occurring on that same day. A preliminary hearing was held on January 24, and defendants were bound over for trial in superior court. Floyd pleaded not guilty in February. After separate counsel was appointed for Milton on February 21 (*ante*, fn. 2), he pleaded not guilty on March 6. Trial was set for March 27. On motion of both defendants' counsel, trial was continued until May 22. The trial was again continued until July 6, over Milton's objections but on motion of his defense counsel, because Milton refused to discuss the case with his attorney who, accordingly, was not prepared for trial. The matter trailed until July 7, when Milton again refused to waive time, and petitioned "for a change of Court on the ground of prejudice." Trial counsel again stated that Milton refused to cooperate, the trial was put over until July 18, when the challenged judge agreed to transfer the case to another judge. On that same day, both defendants' counsel joined in a motion to dismiss the case, on grounds that the defendants had been deprived of a speedy trial; the motion was denied on July 19. With both defendants personally consenting, the matter was put over until July 28, so that counsel could file a petition for writ of prohibition with the Court of Appeal. The Court of Appeal then stayed the matter until August 18, pending decision on the merits.

On August 16, the People obtained a grand jury indictment; on August 18, the information was dismissed on motion of the prosecution; on August 22, the Court of Appeal dismissed the writ of prohibition as moot. Thereafter, various continuances were granted, on motion of defendants, to seek writs of prohibition from the Court of Appeal and this court, which were denied. The matter finally came to trial on December 21, 1967.

All of the continuances after the filing of the indictment were with the consent of Milton and his attorney. (*People* v. *Tahtinen*, 50 Cal.2d 127, 131 [323 P.2d 442].) All of the earlier continuances were with the consent of counsel although Milton objected to the continuances from May 22 through July 18. Even assuming that the attorney's consent to the continuances over the client's objection would not constitute a waiver of the right to speedy trial (see *People* v. *Addison, supra,* 256 Cal.App.2d

18, 22, 26), Milton's claim of a denial of his right to a speedy trial must be rejected for another reason.

Although a criminal defendant may not be deprived of a speedy trial because the prosecution—or the defense—is lazy or indifferent, or because the prosecution seeks to harass the defendant rather than bring him fairly to justice, a criminal defendant may not juggle his constitutional rights in an attempt to evade prosecution. He may not demand a speedy trial and demand adequate representation, and, by the simple expedient of refusing to cooperate with his attorney, force a trial court to choose between the two demands, in the hope that a reviewing court will find that the trial court has made the wrong choice. "We cannot tolerate such bad faith and we are not constitutionally required to do so. [Citations.]" (*People* v. *Smyers,* 261 Cal.App.2d 690, 700 [68 Cal.Rptr. 194].)

In the instant case, the continuances granted over Milton's objections were requested by the attorney and granted by the trial court because of Milton's obdurateness in refusing to talk to his attorney. Milton's refusal to cooperate combined with his insistence on an immediate trial were properly characterized by the trial court as "a very neat device for anybody to escape prosecution." The device should not be permitted to succeed.[3]

## FELONY-MURDER RULE

Milton contends that an unarmed accomplice to a killing occurring in the perpetration of a robbery should not "per se" be deemed to be guilty of first degree murder. He asks us to judicially invalidate section 31 of the Penal Code, which defines "principals" to a crime as including all who "directly commit the act . . . or aid and abet in its commission, . . ." to overrule *People* v. *Cabaltero,* 31 Cal.App.2d 52, 56-57 [87 P.2d 364], which held that the felony-murder rule applies to all participants in one of the enumerated felonies under section 189 of the Penal Code, and *People* v. *Washington,* 62 Cal.2d 777, 782-783 [44 Cal.Rptr. 442, 402 P.2d 130], which reiterated the *Cabaltero* rule. The suggestion is without merit.

Milton relies on the 1949 amendment to section 1203 of the Penal Code, which deals with the granting of probation. Before the 1949 amendment, probation could not be granted "to one who, although not personally armed with a deadly weapon, acted with a companion who was so armed. [Cita-

---

[3]Since we find that neither defendant was deprived of a speedy trial, we need not reach defendants' further contention that the procedural requirements of *People* v. *Wilson,* 60 Cal.2d 139 [32 Cal.Rptr. 44, 383 P.2d 452], when combined with section 1387 of the Penal Code, which permits refiling of felony complaints after dismissal, deprives defendants of the right to a speedy trial.

tions.]" (*People* v. *Perkins,* 37 Cal.2d 62, 63 [230 P.2d 353].) In 1949, the Legislature amended the words "who . . . was armed" to "who . . . was *himself* armed . . . ." (Stats. 1949, ch. 1329, § 1, at pp. 2324, 2325.)

*Perkins* construed the amendment to grant the trial court discretion to order probation where the participant in the crime seeking probation was not himself armed. (37 Cal.2d at p. 64.) But *Perkins* made clear that the amendment to section 1203 did not change the definition of the substantive crime involved: "It should be noted that . . . the fact that defendant Perkins was not 'himself' armed with a 'dangerous or deadly weapon' does not make him any the less, in a legal sense, guilty of robbery in the first degree, which is defined by section 211a of the Penal Code. Perkins is guilty of first degree robbery, regardless of the precise acts which he committed personally, because he aided and abetted in its commission (Pen. Code, § 31). Indeed it was by analogy to this rule, which makes all willful participants in a crime guilty as principals, that it was originally held that a defendant in the situation of Perkins could not have probation. . . ." (37 Cal.2d at pp. 64-65; fns. omitted; see also, *People* v. *Barclay,* 40 Cal.2d 146, 155-156 [252 P.2d 321].)

Milton contends nonetheless that the application of the felony-murder rule to unarmed accomplices conflicts with the legislative *policy* underlying section 1203 of the Penal Code. That contention is untenable. The purpose of the 1949 amendment was not to discourage felons from arming themselves but to extend the discretion of the trial court in determining when probation is appropriate. That purpose is made clear by subsequent amendments to section 1203.

In 1957, section 1203 was amended to allow the trial court "in unusual cases" to grant probation to a person convicted of robbery who was himself armed. (Stats. 1957, ch. 2054, § 1, at pp. 3648, 3649.) In 1965, section 1203 was again amended to allow the trial court "In unusual cases . . . with the concurrence of the district attorney" to grant probation to persons convicted of murder who were themselves armed. (Stats. 1965, ch. 1720, § 1, at pp. 3867, 3870.) Thus, the distinction between armed and unarmed felons, and "ordinary" felonies and murder, rather than being enhanced, as defendant would find, has been diminished, for purposes of the trial court's discretion in deciding whether probation would be awarded.

Finally, the conclusive presumption of malice as to Milton is not "needlessly harsh." Milton contends that "he neither committed nor encouraged commission of a homicide." That contention baldly misstates the record; Floyd held the gun, and Milton struggled with the driver for the money.

Assuming that a case might exist in which the accomplice strove to his utmost to engage in a simple second degree robbery, this is not the case.

### EFFECTIVE ASSISTANCE OF COUNSEL

 Milton contends that he was deprived of effective assistance of counsel, and that the proceedings were reduced to a farce and a sham, because his trial attorney (1) called only three of five possible alibi witnesses, and did not interview those not called; (2) did not move to exclude in-court identifications of Milton at the guilt trial on grounds that the identifications were a product of an unfair pretrial confrontation; (3) did not move to exclude in-court identifications of Milton at the penalty trial, for the same reasons. None of these contentions has merit.

In *People* v. *Ibarra*, 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487], we held that it is "counsel's duty to investigate carefully all defenses of fact and of law that may be available to the defendant, and if his failure to do so results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled. [Citations.]" In *Ibarra*, the record made clear that the attorney did not know the "commonplace" rule concerning standing to challenge an illegal search and seizure. (60 Cal.2d at p. 465.) *Ibarra* emphasized that "It must appear that counsel's lack of diligence or competence reduced the trial to a 'farce or a sham.'" (60 Cal.2d at p. 464.)

 It is not sufficient to allege merely that the attorney's tactics were poor, or that the case might have been handled more effectively. (E.g., *People* v. *Reeves*, 64 Cal.2d 766, 773 [51 Cal.Rptr. 691, 415 P.2d 35], cert. den., 385 U.S. 952 [17 L.Ed.2d 229, 87 S.Ct. 332]; *People* v. *Brooks*, 64 Cal.2d 130, 140 [48 Cal.Rptr. 879, 410 P.2d 383]; *People* v. *Perry*, 271 Cal.App.2d 84, 111 [76 Cal.Rptr. 725]; *People* v. *Ferguson*, 255 Cal.App.2d 493, 496 [63 Cal.Rptr. 93].)

Rather, the defendant must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics.

 Milton's sole defense was that of alibi. His counsel on appeal contends that the defense was reduced to a farce and a sham because Milton's attorney at the trial called "only" three of five possible alibi witnesses. However, the choice of which, and how many, of potential witnesses is precisely the type of choice which should not be subject to review by an appellate court. Indeed, there is not even any basis for accusing Milton's counsel of poor tactics in his choice of witnesses: He

called Milton's half-brother and sister, and a woman who formerly lived with the half-brother, who all supported the alibi defense. None of these witnesses was impeached on the grounds of prior criminal records. The half-brother also provided an explanation for Milton's possession of the currency in small denominations. The attorney did not call a cousin, Richard Myles, who was imprisoned at the time of trial, and who (because he was the same height as Milton) the defense attempted to insinuate might be the real culprit. He did not call a woman, Carolyn Billie Whitley, whose name Milton could not remember at his trial.

Milton complains that the trial attorney did not interview the two prospective witnesses. We know of no rule which requires an attorney to interview all prospective witnesses, particularly when, as here, one of the prospective witnesses was prima facie undesirable.

To support the allegation that Milton's attorney was "incompetent," counsel on appeal have submitted affidavits from the witnesses who were not called, stating they were not interviewed and request that we take further evidence on the matter. Our function on appeal is limited to a consideration of matters contained in the record of the trial proceedings. (*People* v. *Merriam,* 66 Cal.2d 390, 396-397 [58 Cal.Rptr. 1, 426 P.2d 161].) In any event, there is nothing in Milton's allegations of incompetence to justify our expanding a more than adequate record. The motion is denied.

One of the passengers on the bus who identified Floyd and Milton at the trial was a Mrs. Foster, who sat opposite defendants on the bus for 25 to 30 minutes, before they committed the robbery and murder. She described the defendants as follows: Floyd was wearing light green pants, a long-sleeved white dress shirt, high-topped light-brown shoes, glasses and a hat, and was considerably shorter and heavier than Milton. Milton was wearing dark pants, black shoes, and a "print-type" shirt; the right cuff on Milton's pants had fallen down. In court, she estimated that Floyd was about 5 feet, 7 inches tall, and that Milton was about 6 feet, 1 or 2 inches tall. She identified both Floyd and Milton in a lineup conducted at the police station the evening of the same day the defendants were arrested.

Charles McAfee, who was stopped in his car behind the bus, identified Milton as one of the men who ran away from the bus after the robbery. He furnished the police with a detailed description of Floyd and Milton, although at the trial he testified only that Floyd was about 5 feet 6 or 7 inches tall, and weighed about 160 pounds, and that Milton was around 6 feet 6 inches tall, weighed about 190 pounds, and had an "orangish

brown" sweater or light shirt. McAfee indentified Milton at the police station shortly after Milton was arrested.

 Milton claims that the pretrial identification by Mr. McAfee and Mrs. Foster was impermissibly suggestive and deprived him of due process of law, and that the failure of Milton's counsel to demand a hearing outside the presence of the jury on the issue of improper pretrial identification reduced the proceedings to a sham and a farce.

*United States* v. *Wade* (1967) 388 U.S. 218, 237 [18 L.Ed.2d 1149, 1162, 87 S.Ct. 1926], held that a defendant who is required to appear in a lineup for purposes of identification by a witness has a right, absent knowledgeable waiver, to have counsel present at the lineup. If this right is violated, the government must then be allowed "the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." (388 U.S. at p. 240 [18 L.Ed.2d at p. 1164].) *Gilbert* v. *California* (1967) 388 U.S. 263, 272 [18 L.Ed.2d 1178, 1186, 87 S.Ct. 1951], made clear that where a defendant is placed in a lineup without counsel being present or waived, it is constitutional error to admit the "in-court identifications without first determining that they were not tainted by the illegal lineup but were of independent origin . . . ."

*Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967], applied the lineup rules to individual confrontations of the defendant and witness (388 U.S. at p. 295 [18 L.Ed.2d at p. 1202]), and held that the rules of *Wade* and *Gilbert* must be applied only to confrontations occurring after the date of those opinions (*id.,* at p. 296 [18 L.Ed.2d at p. 1203]). The majority of this court adopted the same rule in *People* v. *Feggans,* 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21]. However, *Stovall* also held that a pre-*Wade* or pre-*Gilbert* lineup could be so "unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny a defendant due process of law. (388 U.S. at p. 302 [18 L.Ed.2d at p. 1206].) Whether a confrontation was so unfairly suggestive "depends on the totality of the circumstances surrounding it, . . ." (*Id.*)

 Thus, unlike cases to which *Wade* and *Gilbert* apply, in which the mere fact of the confrontation having occurred without an attorney being present or the right to an attorney having been waived places the burden on the prosecution to show that the in-court identification was not tainted, in cases where *Wade* and *Gilbert* do not apply, before the defendant "may invoke an exclusionary concept he must demonstrate that the lineup 'resulted in such unfairness that it infringed his right to due process of law.' (*Stovall* v. *Denno* (1967) 388 U.S. 293, 299 . . . .)" (*People* v. *Caruso,* 68 Cal.2d 183, 184 [65 Cal.Rptr. 336, 436 P.2d 336];

see also, *People* v. *Burns,* 270 Cal.App.2d 238, 244 [75 Cal.Rptr. 688]; *People* v. *Romero,* 263 Cal.App.2d 590, 593 [69 Cal.Rptr. 748].)

Where a defendant does establish that an identification has been "unnecessarily suggestive and conducive to irreparable mistaken identification" (*Stovall* v. *Denno, supra,* 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206, 87 S.Ct. 1967]), the prosecution must then, as in cases to which *Wade* and *Gilbert* apply, "on *voir dire* show by clear and convincing proof that the in-court identifications were based upon observations of the accused at the scene of the robbery." (*People* v. *Caruso, supra,* 68 Cal.2d 183, 189.)

There is, however, nothing in the language of *Wade, Gilbert, Stovall, Caruso,* or any of the cases following that suggests that a demand for a *voir dire* hearing on the issue is required or appropriate regardless of the circumstances of the lineup. A hearing outside the jury's presence is required only where there is some factual conflict concerning the fairness of the lineup. (*People* v. *Burns, supra,* 270 Cal.App.2d 238, 244-245; *People* v. *Douglas,* 259 Cal.App.2d 694, 697-698 [66 Cal.Rptr. 492].) There is no factual conflict in the instant case as to the composition of the lineup or the circumstances of the identification.

Nor was the pretrial identification of Milton unfair. Mrs. Foster was asked to identify Milton and Floyd out of a lineup consisting of six young male Negroes, including defendants. Two of the men were apparently intended to be matched to Floyd, and the propriety of the identification of Floyd is not challenged.

The other two men were presumably to be matched to Milton. Milton was 6 feet 4 inches tall and weighed 140 pounds. One man was 6 feet 3 inches tall and weighed 198 pounds. The other man was 6 feet 4 inches tall and weighed 175 pounds. Milton was wearing the unhemmed pants which he wore when arrested; his pants had been taken from him after he was arrested, and he was requested to change back into the unhemmed pants for the lineup.

Although the other men may have been darker in complexion and not as thin, the men in the lineup were sufficiently similar in appearance to Milton so that the lineup was not "*unnecessarily* suggestive." (*Stovall* v. *Denno, supra,* 388 U.S. at p. 302 [18 L.Ed.2d at p. 1206]; italics added.)

In *People* v. *Farley,* 267 Cal.App.2d 214, 218 [72 Cal.Rptr. 855], the mere fact that others in the lineup were "taller" than the defendant did not make the identification unfair. Similarly, in *People* v. *Lasiter,* 265

Cal.App.2d 361, 363, 366 [71 Cal.Rptr. 218], where all six men were of similar height and similarly garbed, the lineup was not unfair because only the defendant was of Anglo-Saxon extraction, the others being Latin-American extraction. (Compare *People* v. *Menchaca,* 264 Cal.App.2d 642, 644-645 [70 Cal.Rptr. 843].)

*Wade* itself provides examples of the types of suggestive lineups that the *Wade* rule was formulated to prevent: A six-man lineup consisting of only one Oriental, the defendant; one black-haired person among light-haired persons; a tall defendant with short men; a youthful defendant with men over 40 years of age. (*United States* v. *Wade, supra,* 388 U.S. 218, 232 [18 L.Ed.2d 1149, 1160, 87 S.Ct. 1926].) In *Foster* v. *California* (1969) 394 U.S. 440 [22 L.Ed.2d 402, 89 S.Ct. 1127], the defendant was nearly 6 feet tall, and placed in a lineup consisting of two others who were 5 feet 5 or 6 inches tall. In *People* v. *Caruso, supra,* 68 Cal.2d 183, 187, footnote 1, the defendant was 6 feet 1 inch tall, weighed 238 pounds, had a very dark complexion and dark wavy hair. *None* of the persons in the lineup *approximated* his size and not one had his dark complexion.

No such suggestiveness is found in the lineup in the instant case.

Milton contends, however, that the lineup is unfair because he was required to wear the trousers in which he was arrested, the right cuff of which was loose. We are, however, cited to no authority for the proposition that it is a denial of due process to require a suspect to wear the clothes in which he was arrested. Milton places great weight on the fact that he was asked to remove his trousers when arrested (and given other trousers) but that his trousers were returned to him before he was placed in the lineup. Whether a defendant is required to change clothes one time or twenty times is irrelevant to the issue whether it is unfair to require a defendant to appear in a lineup in the clothes he was wearing when arrested.

We recognize, of course, that a suspect might be dressed in such a striking outfit that to place him in a lineup with others not similarly garbed would be as unfairly suggestive as to place one Oriental in a lineup of all Caucasians. That is not the situation in the instant case. According to Milton's testimony, when arrested he was wearing black pants, a T-shirt, and black shoes. His outfit was ordinary. There was no need for the police to match the outfits of everyone in the lineup anymore than the police were required to match the physical proportions of the other men with scientific exactitude.

Milton contends that requiring him to wear the trousers in which he was arrested was, in this particular situation, unfair, because witness "Foster's memory with regard to [Milton] focused solely upon a pair of

pants with an unhemmed cuff." This is a bald misstatement of the record, as is made clear from the description provided by Mrs. Foster, discussed above. It is true that Mrs. Foster conceded that it would be "a fair statement" that she remembered the pants worn by Milton more than anything else about him, but that concession hardly qualifies as a statement that her recollection was directed "solely" to his trousers.

Milton contends that the confrontation with witness McAfee was improperly suggestive. The contention is without merit. Milton was arrested at 2:30 or 3 p.m., and apparently was booked about 4 p.m. Shortly thereafter, between 4 p.m. and 5 p.m., McAfee was requested to come to the police station, where Milton was with a police officer. McAfee positively identified Milton as one of the two men who ran away from the bus.

The "single person showup" is not inherently unfair. (*Stovall* v. *Denno, supra,* 388 U.S. 293, 302; *People* v. *Burns, supra,* 270 Cal.App.2d 238, 246; *People* v. *Singletary,* 268 Cal.App.2d 41, 45 [73 Cal.Rptr. 855]; *People* v. *Irvin,* 264 Cal.App.2d 747, 759-760 [70 Cal.Rptr. 892]; *People* v. *Smith,* 263 Cal.App.2d 631, 636-637 [69 Cal.Rptr. 670]; *People* v. *Romero, supra,* 263 Cal.App.2d 590, 593.) Milton concedes that McAfee was brought to the jail shortly after Milton was arrested, and within several hours of the robbery. The police are not to be criticized because they attempted to establish an affirmative identification as promptly as possible. The sole grounds for Milton's arrest was that he matched the description provided by the witnesses.[4]

It was in the interest of both Milton and the police to be confronted with a witness as promptly as possible. (See, *Stovall* v. *Denno, supra,* 388 U.S. 293, 302 ["Here was the only person in the world who could possibly exonerate Stovall. . . ."]; *People* v. *Irvin, supra,* 264 Cal.App.2d 747, 760 ["If innocent men had been apprehended should they await the assembling of a lineup, and the summoning of counsel, while the real perpetrators put more time, and presumably distance, between themselves and the focal point of the offense?"]; *People* v. *Romero, supra,* 263 Cal. App.2d 590, 593.)

When McAfee saw Milton at the police station Milton was "down to a T shirt." However, McAfee also saw "a piece of material of a brownish orange color, a shirt or a sweat shirt or something like that." Milton contends that the presence of the sweater or shirt was unnecessarily suggestive, because an orange brownish shirt or sweater was all that McAfee

---

[4]The singly folded one and five-dollar bills were discovered after he was arrested. The numbered bus transfer and the murder weapon were not discovered until the police searched his half-brother's apartment after obtaining a warrant.

could recall of Milton's clothing, and because the police did not have in their possession at the time of Milton's arrest an orangish brown sweater. The contention misstates the record. According to the Affidavit in Support of Search Warrant, and Police Property Report,[5] when arrested the police took a gold-colored shirt in custody which Milton stated was the one he carried into the apartment. Further, in the Affidavit in Support of Search Warrant, McAfee provided the police with a detailed description of Milton, both as to his physical appearance and clothes.[6]

The confrontation between McAfee and Milton was not so suggestive as to deprive Milton of due process.

■ Finally, Milton challenges the competence of his attorney for not attempting to exclude the in-court identification of Milton, at the penalty trial, in connection with two alleged prior crimes, because the pretrial confrontation which preceded the in-court identification was improper.[7] The contention is without merit. When the penalty trial was reached, Milton had been convicted of first degree murder and first degree robbery. Evidence was introduced to prove that he had committed a bus robbery in October 1966, a bus robbery in March 1966, a liquor store robbery in December 1966, and a service station robbery in August 1966.[8]

Even assuming that the testimony of one of the two witnesses to the December 1966 liquor store robbery and the testimony of each of the witnesses to the March and October 1966 bus robberies could have been excluded, the failure of Milton's counsel to object cannot be said to have constituted conduct equivalent to "withdrawing a crucial defense from the case," thus depriving him of effective assistance of counsel. (*People* v. *Ibarra, supra,* 60 Cal.2d 460, 464.)

### PENALTY PHASE
### PRIOR CRIMES—SUFFICIENCY OF EVIDENCE

■ At the penalty trial, the prosecution attempted to prove that Milton or Floyd or both of them had committed other crimes. Milton challenges the sufficiency of the evidence to prove two of the crimes, a bus robbery with Floyd in March 1966 and another bus robbery in

---

[5]Documents before this court, it should be noted, on motion of defendant Milton.

[6]Male Negro, approximately 18 years of age, 6 feet 3 inches tall, 170 pounds, short-cropped black hair, carrying an orange or brown sweater, wearing dark trousers, and high-top laced medium brown shoes.

[7]The lineups preceded the *Wade* decision.

[8]The prosecution also introduced evidence proving that Milton had been declared a ward of the California Youth Authority, for possession of marijuana, but the trial court ordered the jury to disregard that evidence.

October 1966. ■ Evidence of such crimes, even though defendants were not charged or convicted of the crimes, is admissible at the penalty trial, but they must be proven beyond a reasonable doubt before the jury may consider them.[9] (*People* v. *Varnum,* 70 Cal.2d 480, 485 [75 Cal. Rptr. 161, 450 P.2d 553]; *People* v. *Durham,* 70 Cal.2d 171, 187, fn. 15 [74 Cal.Rptr. 262, 449 P.2d 198].) However, on appeal our sole function is to determine whether or not substantial evidence was presented from which the jury could reasonably have found that defendant had committed the uncharged offenses. (*People* v. *Durham, supra,* at p. 189, fn. 16.)

■ *March 1966 Bus Robbery*—Mr. Raziano, a bus driver, provided the only evidence concerning the bus robbery in March 1966. He tentatively identified both Floyd and Milton in court, stating, "I think" the robbers were Floyd and Milton. Raziano testified that in January 1967 he had picked out Floyd and Milton from about 10 or 12 photographs which the police showed him, and that he had picked Floyd and Milton from a lineup of 10 or 12 men.

He conceded, however, on cross-examination that the lineup occurred 10 or 11 months after the robbery; that the whole incident on the bus took about a minute or two; that when the robbery occurred "I was worrying about myself"; that at the lineup he told the police he was not sure of his identification; that after being shown photographs, he told the police he was not sure of his identification, and that, as to his courtroom identification of Floyd and Milton, "I am not certain, no," that Floyd or Milton or either of them robbed him. A special agent for the Rapid Transit District testified that Raziano had never identified Floyd or Milton from mug shots.

Although on redirect examination, he stated, "Yes, I am sure of one. . . . Mr. Floyd," he did not commit himself as to Milton. Cross-examination by Milton's attorney made clear his uncertainty as to Milton.

"Q But any Negro that would be sitting, about Milton's complexion

---

[9]The jury was instructed that "Evidence of other crimes alleged to have been committed by the defendants may not be considered as evidence in aggravation unless proved beyond a reasonable doubt." The jury was further instructed that the term "reasonable doubt" is "that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, that such other crimes have been committed by the defendants."

and about the same height, as long as he is sitting near Floyd, you would say he is the man?

"A I imagine so."

The lack of positive identification of Milton merely went to the weight of the foregoing testimony and not to its admissibility (*People* v. *Gonzales*, 68 Cal.2d 467, 472 [67 Cal.Rptr. 551, 439 P.2d 655]). In view of certain similarities between the March 1966 robbery and the robbery of which Milton was convicted at the guilt trial, we are not prepared to hold that Raziano's testimony could have furnished no substantial evidence whatsoever from which the jury could have determined that Milton also committed the prior offense.[10]

Moreover, the record discloses that Milton's counsel failed to object to the admission of this evidence at trial, failed to move to strike Raziano's testimony, and failed to request an instruction admonishing the jury to disregard that testimony.[11] Since Milton interposed no objection at trial to the introduction of the evidence of this prior offense, he cannot now raise the objection for the first time on appeal (*People* v. *Varnum, supra,* 70 Cal.2d 480, 486; *People* v. *Teale,* 70 Cal.2d 497, 519-520 [75 Cal. Rptr. 172, 450 P.2d 564]).

*October 1966 Bus Robbery*—The contention that the evidence is insufficient to prove that Milton robbed one Ross, a driver for the Los Angeles Rapid Transit District, in October 1966, is without merit. Ross testified that Milton "looked like the man" who held him up; that he "believe[d]" Milton was the man who held him up; that he was "saying he looks like the man."

---

[10]In *People* v. *Haston,* 69 Cal.2d 233, 246 [70 Cal.Rptr. 419, 444 P.2d 91], we noted that an inference of identity arises when the marks common to the charged and uncharged offenses logically operate to set these offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses. We also pointed out in *Haston* that one significant common mark in that case was the presence of the same person as one of the perpetrators of both the charged and uncharged offenses (69 Cal.2d at pp. 249-250; see also *People* v. *Cavanaugh,* 69 Cal.2d 262, 273 [70 Cal. Rptr. 438, 444 P.2d 110]).

In the instant case, defendant Floyd was present, as a perpetrator, at both the March 1966 bus robbery and the "charged" offense, a second bus robbery of which Floyd and Milton were convicted at the guilt trial. Floyd's presence, as a perpetrator, at both the charged and uncharged *bus* robberies reasonably could tend to suggest that Milton, the convicted perpetrator of the charged offense, also perpetrated the uncharged offense.

[11]Milton did move successfully to strike evidence that he had been declared a ward of the California Youth Authority, for possession of marijuana.

### Confession of Codefendant Floyd

Prior to the penalty trial, Milton's counsel had moved to sever the trial on the ground that codefendant Floyd had made a confession to a psychiatrist, Dr. Tweed, which implicated Milton. The court denied the motion, but instructed Floyd's counsel and the prosecutor to admonish Tweed to delete all references to Milton and to testify only on those matters pertaining to the possibility of Floyd's rehabilitation. Milton's counsel suggested that it would be impossible effectively to delete such testimony, and requested the court to review Tweed's report, but the court indicated that such a reading would be premature, stating that "I want to meet this issue clear-cut at the time I am confronted with it."

Floyd did not testify at either the guilt or penalty trials. At the penalty trial, Dr. Tweed related to the jury Floyd's confessions to Tweed that he had robbed and shot the busdriver. The point of the testimony was to show that Floyd did not intend to shoot the busdriver, but that "all of a sudden the gun went off." At no time did Tweed use Milton's name in relating Floyd's confession. However, during Tweed's examination, the following testimony was elicited:

"Q [by Floyd's counsel]: Did he [Floyd] say where he had gotten the gun?

"A Yes, he said he had gotten the gun from some friend.

"Q Did he say where he was taking it?

"A He stated he was taking it to a relative of this friend from whom he had gotten the gun."

Milton's counsel did not object to the foregoing testimony. However, after Tweed was excused, and in the judge's chambers, Milton's counsel requested a mistrial on the penalty phase, on the ground that the only possible inference from Tweed's testimony was that Floyd had obtained the gun from Milton, since other evidence disclosed that the gun was found in the apartment of Milton's half-brother, where defendants had been apprehended.

The court denied the motion, but subsequently instructed the jury "that the psychiatrist's testimony during this penalty trial which disclosed defendant's statements should be considered only for the purpose of exposing the information upon which the psychiatrist based his opinion [regarding Floyd's rehabilitation] and not as evidence of the truth of the statements."

In *Bruton* v. *United States* (1968) 391 U.S. 123, 129-130 [20 L.Ed.2d 476, 481-482, 88 S.Ct. 1620], the Supreme Court "held that the intro-

duction into evidence of a codefendant's extrajudicial statement which inculpates the defendant violates the defendant's Sixth Amendment right to confront the witnesses against him even though the jury is instructed not to consider the statement as evidence against him." (*People* v. *Flores,* 68 Cal.2d 563, 568 [68 Cal.Rptr. 161, 440 P.2d 233].) However, the court in *Bruton* made it clear that not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; the challenged evidence must present a substantial risk that the jury will ignore the instruction. (391 U.S. at p. 135 [20 L.Ed.2d at p. 484].) Accordingly, in *Flores, supra,* we refused to overturn a conviction where the inadmissible evidence provided, at most, only a tenuous basis for an inference of defendant's guilt, and other evidence overwhelmingly demonstrated defendant's culpable knowledge. (68 Cal.2d at p. 568; see also *Harrington* v. *California,* 395 U.S. 250 [23 L.Ed.2d 284, 89 S.Ct. 1726].)

Prior to the *Bruton* decision, we had recognized in *People* v. *Aranda,* 63 Cal.2d 518, 530 [47 Cal.Rptr. 353, 407 P.2d 265], that the introduction of such statements could be prejudicial and that a mere instruction to the jury to "disregard" the confession as to the codefendant might be inadequate. Consequently, we established alternative procedures for situations in which the prosecution proposes to introduce the extrajudicial statement of one codefendant which implicates another codefendant. If the prosecution wishes a joint trial "all parts of the extrajudicial statements implicating any codefendants" must be "effectively deleted without prejudice to the declarant."

Milton contends that *Aranda* and *Bruton* apply to both the penalty and guilt phases of a criminal proceeding, and that *Aranda* and *Bruton* apply whether the incriminating statement is introduced by the prosecution or, as in the instant case, by a codefendant. He further contends that the trial court erred in denying his motion for severance at the penalty trial.
We agree that *Aranda* and *Bruton* apply to the penalty phase of a criminal proceeding. The importance of the right to timely cross-examination has been sufficiently emphasized by this court and the United States Supreme Court and requires no prolonged discussion. (See, e.g., *Barber* v. *Page* (1968) 390 U.S. 719, 721 [20 L.Ed.2d 255, 258, 88 S.Ct. 1318]; *Pointer* v. *Texas* (1965) 380 U.S. 400, 404 [13 L.Ed.2d 923, 926, 85 S.Ct. 1065]; *People* v. *Green,* 70 Cal.2d 654, 664-665 [75 Cal.Rptr. 782, 451 P.2d 422]; *People* v. *Johnson,* 68 Cal.2d 646, 651-652 [68 Cal.Rptr. 599, 441 P.2d 111]; *People* v. *Boggs,* 255 Cal.App.2d 693, 702-703 [63 Cal.Rptr. 430] [assuming the applicability of *Aranda* and *Bruton* to the penalty phase].)

At least where one defendant makes a timely objection to the introduction of the extrajudicial statement of a codefendant, we can see no reason why *Aranda* and *Bruton* should not apply to such statements when it is the codefendant, rather than the prosecution, who seeks to introduce the statement. To hold that the interests of codefendants in a joint trial—especially a joint penalty trial—are identical is to defy reality. Frequently, as in the instant case, one defendant attempts to show that he is less, or his codefendant more, blameworthy, in the hope of avoiding the death penalty. (Cf. *People* v. *Chacon,* 69 Cal.2d 765, 775 [73 Cal. Rptr. 10, 447 P.2d 106].)

The contention that, under *Aranda,* the trial court was required to grant Floyd and Milton separate penalty trials is without merit. The trial court has full discretion to determine a motion for severance, and that discretion will not ordinarily be disturbed by a reviewing court. (*People* v. *Clark,* 62 Cal.2d 870, 883 [44 Cal.Rptr. 784, 402 P.2d 856]; *People* v. *Gant,* 252 Cal.App.2d 101, 112 [60 Cal.Rptr. 154].) *Aranda* makes clear that a separate trial is required only if "all parts of the extrajudicial statements implicating any codefendants" are not or cannot be "effectively deleted without prejudice to the declarant." (63 Cal.2d at p. 530; see also, *People* v. *Massie,* 66 Cal.2d 899, 918 [59 Cal.Rptr. 733, 428 P.2d 869].) The testimony complained of did not relate to the question of rehabilitation, the subject of Dr. Tweed's testimony, and could easily have been deleted.

However, although defendants were not entitled to a separate penalty trial, Milton did have a right, under *Aranda,* to exclude any portions of Floyd's admission which incriminated Milton. The question arises whether or not Milton waived that right by failing to object to the admission of Dr. Tweed's testimony regarding Floyd's statements to him.

We have seen that the court previously had instructed counsel to admonish Tweed to delete all references to Milton. Further, the court indicated that it would meet the issue regarding the implications of Tweed's testimony as deleted, "at the time I am confronted with it." Thus, Milton's counsel was forewarned that at the trial, Tweed might be asked certain questions which could implicate his client. Nevertheless, although counsel did object to various questions asked of Tweed, he failed to object to the questions "Did he [Floyd] say where he had gotten the gun?" and "Did he say where he was taking it?" Since these questions clearly had no relevance to the subject of Floyd's rehabilitation, an objection could have been made on that ground, and the challenged testimony excluded without disclosing to the jury that the testimony would have implicated Milton.

However, we need not rely solely upon counsel's failure to object

to the introduction of this evidence, for we have concluded that any violation of the principles of *Bruton* or *Aranda* was harmless error beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].) ██ As we stated in *People* v. *Flores, supra,* 68 Cal.2d 563, 568, footnote 5, "The improper admission into evidence of a codefendant's extrajudicial statement does not automatically require reversal of the defendant's conviction."

██ In relating Floyd's confession, Tweed made no mention of Milton by name, and in fact did not even indicate that Floyd spoke of an accomplice. Although the jury conceivably could have inferred that Milton was the "friend" who, according to Floyd, gave Floyd the gun, we cannot conclude that any substantial risk was thereby created that the jury would believe Floyd, ignore the court's instruction, and sentence Milton to death. Other evidence was admitted to show that on at least three prior occasions Milton had committed *armed* robbery; on two such occasions he was accompanied by Floyd. Seen in this light, the admission of evidence that Milton possessed a gun and gave it to Floyd cannot be characterized as "substantial error" (*People* v. *Hines,* 61 Cal.2d 164, 168-170 [37 Cal.Rptr. 622, 390 P.2d 398]), which reasonably may have influenced the jury to impose the death penalty.

### PROSECUTOR'S ARGUMENT

██ Floyd and Milton contend that the prosecutor committed prejudicial misconduct in asking the jury to return the death penalty based on considerations of retribution. The prosecutor's argument covered some 28 pages of transcript. Among his statements were: "Don't forget about this man here, Mr. Hartzel, who is now six feet under. He cries out for justice and Mrs. Hartzel, his wife, you think a day will pass the rest of her life when she won't be reminded of the horror of what happened to her husband and suffer very much for it? . . .

"The question is what would be equal punishment for that act. We are not only talking about avenging Mr. Hartzel's death, but Mrs. Hartzel. A great, great, an enormous loss. Sometimes it is too easy to forget about the victim and his loved ones. . . .

"Should these defendants be permitted to live like that [in the prison where it 'is not that bad'], we should say that Mr. Hartzel would never eat another meal, never see his wife again, never listen to music again, never see another sunrise."

Although this court has never held that it is improper for a prosecutor in closing argument in a penalty trial to ask the jury to impose the death penalty for reasons of retribution or vengeance, we have stated in other

contexts that "There is no place in the scheme for punishment for its own sake, the product simply of vengeance or retribution." (*In re Estrada,* 63 Cal.2d 740, 745 [48 Cal.Rptr. 172, 408 P.2d 948].) And, in *People* v. *Love,* 53 Cal.2d 843 [3 Cal.Rptr. 665, 350 P.2d 705], where the issue was the admissibility at the penalty trial of a photograph indicating that the victim had died in great pain, we stated, in finding the photograph prejudicially inflammatory: "Proof of such pain is of questionable importance to the selection of penalty unless it was intentionally inflicted.[3]" And in footnote 3, it was pointed out: "Pain unintentionally inflicted is relevant only to the extent that criminal penalties are designed to exact retribution for the evil done by criminals. Whatever may have been the fact historically, retribution is no longer considered the *primary* objective of the criminal law [citation] and is thought by many not even to be a proper consideration [citations]. Granted, however, that retribution may be a proper consideration, it is doubtful that the penalty should be adjusted to the evil done without reference to the intent of the evildoer. Modern penology focuses on the criminal, not *merely* on the crime. [Citations.]" (53 Cal.2d at pp. 856-857, fn. 3; italics added.)

Although the prosecutor asked the jury to consider retribution in deciding whether to impose the death penalty, he also discussed other pertinent factors, including defendants' commission of other crimes, their premeditation and intent to kill, their lack of remorse, and their amenability to rehabilitation. In these circumstances, the prosecutor's remarks concerning the widow of the slain busdriver did not constitute misconduct. (See *People* v. *Garner,* 57 Cal.2d 135, 156 [18 Cal.Rptr. 40, 367 P.2d 680]; *People* v. *Love,* 56 Cal.2d 720, 731 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809].)

Furthermore neither counsel objected to the statements at the trial, and "Misconduct of the prosecuting attorney may not be assigned as error on appeal if it has not been assigned at the trial unless, the case being closely balanced and presenting grave doubt of the defendant's guilt, the misconduct contributed to the verdict or unless the harmful results of the misconduct could not have been obviated by a timely admonition to the jury." (*People* v. *Varnum, supra,* 70 Cal.2d 480, 488 [75 Cal.Rptr. 161, 450 P.2d 553].) Here the remarks of the prosecutor fall within the general rule and not within either of the exceptions.

### WITHERSPOON—EXCLUSION OF JURORS FOR CAUSE

Defendants challenge the exclusion under section 1074, subdivision 8, of the Penal Code of certain jurors, based on those jurors' opposi-

tion to the death penalty. *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522 [20 L.Ed.2d 776, 784, 88 S.Ct. 1770], holds that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding venirmen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." The court excepted from this ruling prospective jurors who "made unmistakably clear . . . that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them . . . ." (*Id.,* at p. 522, fn. 21 [20 L.Ed.2d at p. 785].)

We must then determine whether all of the excused jurors made it "unmistakably clear" that he or she would automatically vote against the death penalty regardless of the evidence in the case. Of course, as we explain *infra,* our determination in the instant case must be made on the basis of the *voir dire* examination of the entire panel of veniremen conducted during the time the particular veniremen were present in the courtroom and until the time they were excused for cause, including all questions posed and answers given, and additionally all of the circumstances in which each colloquy took place. (*People* v. *Varnum, supra,* 70 Cal.2d 480, 492-493].)

Defendants specifically challenge the exclusion of jurors Rogers, Willis, Bishop and Polizzi. We have independently reviewed the *voir dire* of the other six jurors excluded under section 1074, subdivision 8, of the Penal Code, and find that they were properly excluded under the applicable *Witherspoon* rules.[12]

---

[12]JUROR BERRY— "[The Court] Do you have any comment to make with reference to any of those inquiries [regarding the death penalty]?" Juror Berry: "I am opposed to capital punishment and I feel any opinion I voted on would be biased because I would not vote for a death penalty.
"Q Under any circumstances?
"A No, sir.
"Q Now, in the proper case, if it were submitted to you, are you saying you would not vote the death penalty?
"A That is right."
JUROR ARELLANES— "[The Court] If those questions [concerning the imposition of the death penalty] were asked of you, would you give substantially the same answers?
"A I am against capital punishment.
"Q By that you mean what?
"A The death penalty.
"Q Now, if the proper case were presented to you in which the penalty was to be imposed, are you indicating to the Court at this time that you would not impose the death penalty?
"A Yes, your Honor.
"Q Under no circumstances?

(1) *Juror Rogers.* We have set forth in an appendix that portion of the transcript pertaining to the *voir dire* of jurors Rogers and Willis. As to Miss Rogers, the court had inquired whether "there is any juror that entertains such a conscientious opinion that he would under no circumstances vote

"A That is correct. . . .

"[The Prosecution] Mr. Arellanes, is it your position that you would be unwilling to vote for a verdict of death under any circumstances?

"A Yes."

JUROR PALKA— "[The Court] Now, if those same questions [regarding the death penalty] were asked of you, would you give substantially the same answers?

"A I am opposed to capital punishment.

"Q Now, let me ask you in the proper case would you impose the death penalty?

"A Under no circumstances would I be a party to putting a man to death."

JUROR KIRK— "[The Prosecution] Mr. Kirk, are you opposed to the death penalty?

"A No, I don't believe in it.

"Q You do not believe in the death penalty?

"A No. . . .

"[The Prosecution] Can you imagine a case in which you would vote for the death penalty, or is it your position you would not under any circumstances vote for death?

"A Not on any circumstances."

JUROR OVITT— "[The Prosecution] Are you opposed to the death penalty?

"A Yes.

"Q Is it your state of mind you could not under any circumstances vote for a verdict of death?

"A I don't believe I could."

JUROR LEWANDOWSKI— "[The Court] Do you have any bias or prejudice of any kind with reference to proceedings of this nature or the parties involved?

"A Yes, sir. I am not in favor of the death penalty. I would not be able to vote in favor of the death penalty.

"Q. Under any circumstances?

"A Yes, sir.

"Q What you are telling the Court is that in a proper case you would not impose the death penalty?

"A Yes, sir."

JUROR GARRISON— "[Juror Garrison] . . . I do not believe in the death penalty . . . .

"[The Court] Are you informing the Court that in a proper case you would not impose the death penalty?

"A I don't think under any circumstances.

"Q You don't think—you are not sure?

"A Well, I am sure."

Earlier the court had instructed the jurors concerning their beliefs on the death penalty. "Now, in a case in which the offense charged is punishable by death, the Court is required to ascertain . . . [if a juror who could find a defendant guilty] . . . would, under no circumstances vote for the death penalty in a proper case. . . . The law imposes neither death nor life imprisonment, but presents the two alternatives in the absolute discretion of the jury. The Legislature has formulated no rules to control the exercise of the jury's decision. . . . If there is any juror that entertains such a conscientious opinion that he would under no circumstances vote for the death penalty, would you so indicate?" The inquiry directed towards these six jurors, when placed in the context of the entire *voir dire*, satisfies the requirements of *Witherspoon.* (See *People v. Teale, supra,* 70 Cal.2d 497, 515-516; *People v. Varnum, supra,* 70 Cal.2d 480, 494-495.)

for the death penalty," and Miss Rogers replied "I wouldn't vote for the death penalty."

On *voir dire,* Miss Rogers further stated that in her opinion she could not vote for the death penalty no matter how heinous the crime. However, defense counsel then posed the extreme hypothetical example of a defendant who had killed 10 women and children, had stated that he would kill again if released, and had offered to disclose the location of the bodies of his other victims for $100 each. Miss Rogers replied that she did not "know about that type of person; I never heard of that type of person." Upon further questioning along these lines, Miss Rogers agreed that as to such a hypothetical case, the death penalty was a question of "degree," and that she would "have to get all the facts," before deciding whether or not to impose it.

Subsequently, Miss Rogers was asked by the prosecutor whether she would be willing to vote for a verdict of death under any particular circumstances, and she replied "I can't think of any circumstances now." However, once again she was presented with the hypothetical example described above, and was asked whether she would vote for death in that case. Miss Rogers replied "I don't know if I would or not. I really can't say."

Finally, the prosecutor addressed the jurors as a group, explained that the jury had absolute discretion to determine whether or not a proper case existed to justify the death penalty, and then asked the jury whether they would have the courage to vote for a verdict of death if they determined that this was a proper case. Miss Rogers replied "No, I wouldn't," and was excused by the court.

Although the instant trial preceded the decision in *Witherspoon,* the standards which the trial court imposed comported fully with those announced in *Witherspoon.* Therefore, we could base our decision as to Miss Rogers upon the rule that "Where a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court. [Citations.]" (*People* v. *Linden,* 52 Cal.2d 1, 22 [338 P.2d 397].)

Moreover, we have concluded Miss Rogers made it unmistakably clear that under no circumstances would she impose the death penalty, and, therefore, was properly excused.

(2) *Juror Willis.* In response to the question whether there was "any juror that entertains such a conscientious opinion that he would under no circumstances vote for the death penalty," Juror Willis replied "I am. . . . I don't believe I could send a man to death. I don't believe I could vote to go to the gas chamber."

Subsquently, defense counsel examined Miss Rogers on *voir dire* and, as we noted above, elicited her testimony that she could not vote for the death penalty in any situation, although as to the extreme hypothetical example posed to her, she "really didn't know," since "it depends upon the degree," and "I would have to get all the facts." Thereupon Juror Willis agreed that his answers to the questions posed to Miss Rogers would be "substantially the same" as hers.

Finally, Juror Willis was told that the state sought the death penalty for a killing which occurred during an alleged robbery. Willis stated that he was opposed to sitting on the case for the reason that the death penalty was sought, stating further that "I don't think I would be fair to the State. I don't think it would be fair to the State for me to sit on it." When asked if he had a bias or prejudice in the proceeding, Willis replied, "I am against capital punishment, yes." Thereupon, Juror Willis was excused.

We have previously held in *People* v. *Hill,* 70 Cal.2d 678, 701, footnote 3 [76 Cal.Rptr. 225, 452 P.2d 329], that a juror was properly excluded who answered "I believe so," in response to the question whether the venireman would be unable to return a verdict imposing the death penalty regardless of the evidence.

Moreover, by his initial testimony and by adopting the answers previously given by Miss Rogers, Juror Willis made it unmistakably clear that under no circumstances would he impose the death penalty and, therefore, we conclude that Juror Willis was properly excused.

(3) *Juror Bishop.* Juror Bishop was asked: "Can you imagine a case in which you would be willing to vote for the death penalty, or is your state of mind that you would be unlikely in any situation to vote for death?" He answered: "I would be unlikely in any situation to vote for death." He was then asked, "Well, Mr. Bishop, in a proper case, would you impose the death penalty?" He then answered, "No, I would not."

We have heretofore discussed the ambiguity inherent in the phrase, "proper case." (*People* v. *Teale, supra,* 70 Cal.2d 497, 514-515; *People* v. *Varnum, supra,* 70 Cal.2d 480, 494-495.) However, in *Teale* and *Varnum,* we held that a juror could be properly excluded, based on a response to a question using the phrase, "proper case," where the court has, during the *voir dire* proceedings, "made clear to the assembled panel that the jury would in its sole discretion decide whether the case before it was a 'proper case' for the infliction of the death penalty." (70 Cal.2d at

p. 516.) In the instant case, the court explained to the assembled veniremen: "The law imposes neither death nor life imprisonment, but presents the two alternatives in the absolute discretion of the jury. The Legislature has formulated no rules to control the exercise of the jury's decision." In these circumstances, juror Bishop was properly excluded.

(4) *Juror Polizzi.* Juror Polizzi stated: ". . . I don't believe in the death penalty." She was questioned further by the court:

"Q . . . In a proper case are you telling the Court that you would not impose the death penalty?

"A Yes.

"Q Under any circumstances?

"A (Nods in the affirmative.)"

Juror Polizzi was properly excused.

### WITHERSPOON—EXCLUSION OF JURORS
### BY PEREMPTORY CHALLENGES

Defendants contend that the use by the prosecution of peremptory challenges to exclude jurors who expressed negative views concerning the death penalty is improper under *In re Anderson,* 69 Cal.2d 613 [73 Cal. Rptr. 21, 447 P.2d 117]. However, a different question was raised in *Anderson,* where the Attorney General had argued that any *Witherspoon* error was nonprejudicial since the prosecution had sufficient peremptory challenges remaining to remove all jurors improperly excluded for cause. We rejected this argument, stating that we could not engage in conjecture that the prosecutor would have used his peremptory challenges to excuse such jurors. (69 Cal.2d at p. 620.)

Similarly, we cannot engage in conjecture regarding the prosecutor's reasons for exercising some of his peremptory challenges to excuse some jurors who had reservations concerning the death penalty. Instead, we must assume "that the prosecutor is acting on acceptable considerations related to the case he is trying, the particular defendant involved and the particular crime charged." (*Swain* v. *Alabama,* 380 U.S. 202, 223 [13 L.Ed.2d 759, 774, 85 S.Ct. 824].) *Swain* held that the prosecutor could properly exclude all Negroes from a particular jury, regardless of the factual basis for his belief that such jurors, either as individuals or as a class, might be biased in the particular case to be tried. As the court stated, "In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons

for the exercise of his challenges in any given case." (380 U.S. at p. 222 [13 L.Ed.2d at p. 773].)

In any event, the *voir dire* examination of the jurors fails to establish that any juror was peremptorily challenged solely because of his scruples against the death penalty.

### OTHER CONTENTIONS

Defendant's further contentions concerning the constitutionality of the death penalty and the denial of equal protection in imposing more severe punishment for murder than for attempted murder are without merit.

The judgments are affirmed in their entirety.

McComb, J., Mosk, J., and Sullivan, J., concurred.

## APPENDIX

### *VOIR DIRE* EXAMINATION OF VENIREMEN ROGERS AND WILLIS

"THE COURT: If there is any juror that entertains such a conscientious opinion that he would under no circumstances vote for the death penalty, will you so indicate?

"Miss Rogers, what is your feeling?

"MISS ROGERS: I wouldn't vote for the death penalty.

"Q BY THE COURT: Do you have any conscientious objection to finding the defendants guilty under those circumstances, is that what you are telling the Court?

"A Yes.

"THE COURT: Who else?

"MR. WILLIS: I am.

"Q BY THE COURT: Mr. Willis?

"A Yes.

"Q What do you have to say?

"A I don't believe I could send a man to death. I don't believe I could vote to go to the gas chamber.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"BY MR. LENOIR: Miss Rogers, by saying you don't believe that you could vote for the death penalty, you're not saying you couldn't find a person guilty of an offense?

"A No, I am not saying that.

"Q And you are not saying that, either, are you, Mr. Willis?

"A I am not saying it.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"MR. BOAGS: Miss Rogers, it is your belief that no matter what the person did that you could not vote the death penalty?

"MISS ROGERS: Yes, that is my opinion.

"Q BY MR. BOAGS: No matter how heinous the crime?

"A Yes, sir.

"Q You cannot think of a situation where you could say the death penalty would be a proper one?

"A No.

"Q What if—I would like to give you an example. Say, if a person is proven he-

killed 10 persons, children and women, and very heinous-type crimes. Then this person, after he was arrested, said, 'Yes, I did it and if released I will do it again, and that besides the 10 I killed, for every $100 that you give me, I will show you where the body of another is that I killed.' And if all those facts are proven and the man testified in court substantially the same way, do you think you could impose the death penalty on that person?

"A I don't know about that type of person. I never heard of that type of person.

"Q Well, if you were sitting on a case like that, do you think you could impose it?

"A I really don't know.

"Q What I am getting at is this. In the abstract, you know, it is easy to discuss these subjects about death and life, and what I believe is that it is always a question of degree.

"A That is right.

"Q And what I am trying to find out from you is if you agree with me that the death penalty is a question of degree?

"A Yes.

"Q And would it be fair to say, then, if the proper case was presented to you that you possibly could vote the death penalty, is that right?

"A All I can say is it depends on the degree.

"Q If the proper case was presented, you would vote it?

"A I don't know. I would have to get all the facts.

"Q Right. I would assume that.

"May I have a moment, your Honor?

"(Pause)

"MR. BOAGS: Mr. Willis, you have heard the questions I have just asked, is that correct, sir?

"MR. WILLIS: Yes, sir.

"Q Would it be fair to say if I asked you the same questions, your answers would be substantially the same?

"A Yes.

"Q Also, with you it would be a question of degree, is that right?

"A Sure.

"MR. BUGLIOSI: May I briefly inquire of the jurors?

"THE COURT: Yes.

"MR. BUGLIOSI: Mr. Willis and Miss Rogers, before my colleague, Mr. Boags began questioning you—he has a rather prolific imagination—I believe you said that you both were opposed to the death penalty, is that correct?

"MISS ROGERS: Yes.

"MR. WILLIS: Yes.

". . . . . . . . . . . . . . . .

"MR. BUGLIOSI: Miss Rogers, you realize that the People in this case are asking for the death penalty? You understand that?

"MISS ROGERS: I do now. I didn't know it, but I do now.

"Q We are asking for the death penalty in this case, and I believe you indicated you are basically opposed to the death penalty, is that correct?

"A That is correct.

"Q The murder in this case involves an alleged robbery and a killing during the commission of the robbery. Now, because you are opposed to the death penalty and because the People are asking for the death penalty in this case, would you rather not sit as a juror?

"A Yes, I would rather not.

". . . . . . . . . . . . . . . .

"MR. BUGLIOSI: Miss Rogers, would you be willing to vote for a verdict of death under any particular circumstances?

"MISS ROGERS: I can't think of any circumstances now.

"Q So there are no circumstances that enter your mind which would conceivably cause you to vote for a verdict of death, is that correct?

"A No.

"Mr. Bugliosi: Your Honor, I will make a motion to excuse Miss Rogers for implied bias.

"Mr. Lenoir: Object to that. The lady said she could not think of any circumstances. She is not saying there are no circumstances.

"The Court: The motion will be denied.

"Mr. Bugliosi: What about, Miss Rogers, this ridiculous, preposterous, absurd hypothotical by Mr. Boags about an individual killing 10 babies and then saying, 'I will show you where another baby is for every hundred dollars you give me.' Would you vote for a death penalty in a case like that?

"Mr. Lenoir: Object to the question.

"The Court: The form of the question is improper. The objection will be sustained.

"Mr. Bugliosi: Would you vote for the death penalty in a case like that, ma'am?

"Mr. Lenoir: Object to that.

"The Court: The question is ambiguous. The objection is sustained.

"Mr. Bugliosi: If you do have a factual situation, Miss Rogers, wherein a man killed 10 children, and when they found the man, when they apprehended him, he said, 'For each $100 you give me I will show you where another child is buried,' would you vote for a verdict of death in a case like that?

"Mr. Lenoir: Object to that on the ground it is an improper question, asking the juror to prejudge a set of facts.

"The Court: Objection sustained.

"Mr. Bugliosi: Your Honor, I believe that it is identically or substantially the same question asked by defense counsel, Mr. Boags.

"The Court: Do you want to have the record reread?

"Mr. Bugliosi: Yes, your Honor.

"Mr. Lenoir: I will withdraw the objection in the interest of time.

"The Court: You may proceed. Repeat the question, please.

"(Record read by the reporter.)

"Miss Rogers: I don't know if I would or not. I really couldn't say.

"Mr. Bugliosi: Wasn't your first answer, Miss Rogers, you don't think you would?

"Mr. Lenoir: I will object to that as misleading.

"Mr. Bugliosi: I did hear her say something.

"The Court: The reporter doesn't have any answer.

"Mr. Bugliosi: What about you, Mr. Willis? I take it that you are also opposed to the death penalty?

"Mr. Willis: Yes.

"Q Would you rather not sit on this case as a juror?

"Mr. Boags: Object to that as an improper question.

"The Court: Objection sustained.

"Mr. Bugliosi: This case, Mr. Willis, involves a killing during the perpetration of an alleged robbery, because the People are asking for the death penalty in this case. Are you opposed to sitting on the case?

"Mr. Willis: For that reason only.

"Q For the reason that we are asking for the death penalty? You do not want to ask for it in this case?

"A I don't think I would be fair to the State. I don't think it would be fair to the State for me to sit on it.

"The Court: Then you are indicating to the Court you do have a bias or prejudice in this proceeding?

"MR. WILLIS: I am against capital punishment, yes.

"MR. BUGLIOSI: People would make a motion, your Honor, to excuse Mr. Willis on the ground of implied bias.

"THE COURT: The juror will be excused.

"MR. BOAGS: For the record, your Honor, may I object?

"MR. LENOIR: Both defendants object, your Honor.

"THE COURT: Objection is overruled.

". . . . . . . . . . . . . . . .

"MR. BUGLIOSI: Miss Rogers, getting back to you, did you hear Mr. Willis' remark that because of his opposition to the death penalty he did not feel he could give the prosecution a fair trial? Did you hear him say that?

"MISS ROGERS: Yes.

"Q Do you feel basically the same way?

"A I could give a fair trial. Just because I opposed—I think I could be fair.

"Q Well, you say that you could be fair. I can't ask you to prejudge the facts because the trial hasn't started, you haven't heard any of the evidence, but inasmuch as the prosecution is asking for the death penalty, and the defense, if it ever goes to the penalty trial, will obviously be asking you to come back with the verdict of life, as opposed to death, do you feel right now you are inclined in the direction of life?

"A Yes, I would be.

"Q So even before you have heard any of the evidence, you are biased, if anything, in favor of life?

"A That is right.

"MR. BUGLIOSI: I make a motion, your Honor, under Section 1074, Subdivision 8 of the Penal Code, on the ground of implied bias.

"MR. LENOIR: Objection. She said she could be fair.

"THE COURT: Objection sustained.

". . . . . . . . . . . . . . . . .

"Mrs. Bowman, if you thought that this was a proper case for the imposition of the death penalty, would you personally be willing, and would you personally have the courage to vote for a verdict of death?

"MRS. BOWMAN: Yes.

"MR. BUGLIOSI: Mr. West, how about you, sir?

"MR. WEST: Yes, sir.

"MR. BUGLIOSI: Mr. Smith?

"MR. SMITH: Yes.

"MR. BUGLIOSI: Miss Rogers?

"MISS ROGERS: No.

"Q Even if you thought it was a proper case, you would not have the courage to vote for a verdict of death?

"A. No, I wouldn't.

"MR. BUGLIOSI: I make a motion, your Honor, to excuse the juror on the ground of implied bias.

"THE COURT: The motion is granted.

"MR. BOAGS: Will the record reflect we are objecting?

"THE COURT: Objection is overruled."

**PETERS, J.**—I concur in the majority opinion insofar as it affirms the judgments of guilt, but I dissent insofar as the majority opinion affirms the judgments imposing the death penalty.

In my view, the trial court erred in excusing two jurors for cause, and

each such error alone requires reversal of the penalty judgment as to each defendant. The trial court committed error, as conceded by the majority, with regard to the admission of Dr. Tweed's testimony, and I believe this error requires reversal of the penalty judgment as to Milton. I also believe that the prosecutor was guilty of misconduct in his argument to the jury in the penalty trial.

## WITHERSPOON ERRORS

I disagree with the majority's opinion that jurors Rogers and Willis were properly excluded for cause under the constitutional standards enunciated in *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. The majority assert that these two jurors "made it unmistakably clear that under no circumstances would [they] impose the death penalty." Although these jurors did initially express an automatic opposition to the death penalty under any circumstances, they later expressly retreated from their prior position by stating that they could consider the death penalty under certain circumstances and they never thereafter repudiated this latter view.

These two jurors *affirmatively* indicated an ability to consider the death penalty under certain circumstances. Thus the instant case presents a much clearer violation of *Witherspoon* than the many previous cases which we have reversed for *Witherspoon* error because of the exclusion for cause of jurors who, although expressing opposition to the death penalty, were not questioned sufficiently so as to make clear that this opposition was automatic and immutable. In contrast to such prior cases, the two jurors in the present case were questioned at length concerning their opposition to the death penalty and expressly indicated that their opposition was *not* automatic and immutable.

At the outset of *voir dire* both Miss Rogers and Mr. Willis indicated they would not vote for the death penalty under any circumstances.[1] Had the

---

[1] In obvious reference to Mr. Willis' initial answer, the majority unnecessarily and, in my opinion, incorrectly assert that the answer "I believe so" is by itself an unambiguous response.

In response to the trial court's question whether there was "any juror that entertains such a conscientious opinion that he would under no circumstances vote for the death penalty," Mr. Willis replied "I am. . . . I don't believe I could send a man to death. I don't believe I could vote to go to the gas chamber." This response by itself is an unambiguous expression of automatic opposition to the death penalty under any circumstances because of the direct and unambiguous reply "I am." The subsequent use of the phrase "I don't believe" to amplify his prior unequivocal answer does not, in the circumstances here presented, render the prior answer ambiguous.

In my opinion, the response "I don't believe" is not by itself sufficiently unambiguous to satisfy *Witherspoon*. This court repeatedly has expressly held that the response "I don't think" does not by itself satisfy the *Witherspoon* requirement of unambiguous expression of an automatic opposition to the death penalty under any circumstances (*In re Hillery,* 71 Cal.2d 857, 863 [79 Cal.Rptr. 733, 457 P.2d 565]; *People v.*

*voir dire* of these jurors ended at this point, I would agree that they were properly excluded for cause under *Witherspoon.*

However, upon questioning by defense counsel thereafter, Miss Rogers stated that she did not know whether she could impose the death penalty in a case such as the aggravated hypothetical case posed to her and that whether she could impose the death penalty if "the proper case" were presented "depends on the degree" and on "all the facts." Mr. Willis expressly adopted these answers given by Miss Rogers and added that with him too "it would be a question of degree." *Miss Rogers and Mr. Willis thereby expressly retracted their initial statements and indicated a willingness to consider the death penalty in certain cases. Neither juror subsequently repudiated this view either expressly or impliedly.*

Defense counsel's questioning of Miss Rogers and Mr. Willis was as follows:

"MR. BOAGS: Miss Rogers, it is your belief that no matter what the person did that you could not vote the death penalty?

"MISS ROGERS: Yes, that is my opinion.

"Q BY MR. BOAGS: No matter how heinous the crime?

"A Yes, sir.

"Q You cannot think of a situation where you could say the death penalty would be a proper one?

"A No.

"Q What if—I would like to give you an example. Say, if a person

---

*Osuna,* 70 Cal.2d 759, 768 [76 Cal.Rptr. 462, 452 P.2d 678]; *People* v. *Chacon,* 69 Cal.2d 765, 772-773 [73 Cal.Rptr. 10, 447 P.2d 106]), and I cannot understand how the phrase "I don't believe" is any more clear than the phrase "I don't think." Indeed, this court has never explicitly held that the phrase "I don't believe" satisfies the requirements of *Witherspoon,* and there is language of this court suggesting the contrary. (See *People* v. *Vaughn,* 71 Cal.2d 406, 416 [78 Cal.Rptr. 186, 455 P.2d 122].)

The majority cite *People* v. *Hill,* 70 Cal.2d 678, 701, fn. 3 [76 Cal.Rptr. 225, 452 P.2d 329], as holding that a venireman was properly excluded who answered "I believe so" in response to the question whether he would be unable to return a verdict imposing the death penalty regardless of the evidence. However, the venireman in *Hill,* upon further questioning by the trial court, responded, "I believe that is my feeling, *yes." (Id.,* italics added.) Thus *Hill* does not stand for the proposition that the phrase "I believe" by itself satisfies *Witherspoon,* because the juror held properly excluded in that case both reiterated his original statement and, more importantly, clarified his answer by an affirmative "yes" upon further questioning by the court.

is proven he killed 10 persons, children and women, and very heinous-type crimes. Then this person, after he was arrested, said, 'Yes, I did it and if released I will do it again, and that besides the 10 I killed, for every $100 that you give me, I will show you where the body of another is that I killed.' And if all those facts are proven and the man testified in court substantially the same way, do you think you could impose the death penalty on that person?

"A I don't know about that type of person. I never heard of that type of person.

"Q Well, if you were sitting on a case like that, do you think you could impose it?

"A I don't really know.

"Q What I am getting at is this. In the abstract, you know, it is easy to discuss these subjects about death and life, and what I believe is that it is always a question of degree.

"A That is right.

"Q And what I am trying to find out from you is if you agree with me that the death penalty is a question of degree?

"A Yes.

"Q And would it be fair to say, then, if the proper case was presented to you that you possibly could vote the death penalty, is that right?

"A All I can say is it depends on the degree.

"Q If the proper case was presented, you would vote it?

"A I don't know. I would have to get all the facts.

"Q Right. I would assume that. May I have a moment, your Honor? (Pause.)

"MR. BOAGS: Mr. Willis, you have heard the questions I have just asked, is that correct, sir?

"MR. WILLIS: Yes, sir.

"Q Would it be fair to say if I asked you the same questions, your answers would be substantially the same?

"A Yes.

"Q Also, with you it would be a question of degree, is that right?

"A Sure."

The majority misinterpret the record when they state that "by his initial testimony and by adopting the answers previously given by Miss Rogers, juror Willis made it unmistakably clear that under no circumstances would

he impose the death penalty . . . ." It is true that Mr. Willis' initial testimony did indicate an opposition to the death penalty no matter what the circumstances. However, the *voir dire* transcript above quoted clearly demonstrates that the answers of Miss Rogers that Mr. Willis adopted were those indicating that she was uncertain whether she could vote for the death penalty in the aggravated hypothetical case and that whether she could impose the death penalty in "the proper case" "depends on the degree." Mr. Willis' adoption of these answers, far from making clear an unalterable opposition to the death penalty under any circumstances, indicated that there were indeed circumstances in which he would consider the death penalty. Moreover, Mr. Willis, in addition to adopting the answers of Miss Rogers, stated that imposition of the death penalty was "a question of degree." Thus Mr. Willis expressly retreated from his initial position by indicating that he would be willing to consider the death penalty in certain cases, and it is clearly incorrect to hold—as the majority do—that "by his initial testimony and by adopting the answers previously given by Miss Rogers, Juror Willis made it unmistakably clear that under no circumstances would he impose the death penalty . . . ."

Moreover, it should be noted that Mr. Willis' statements made after his expression of willingness to consider the death penalty under certain circumstances are consistent with that expression. The majority do not contest this point; they do not contend that his later statements justified his exclusion.

Mr. Willis subsequently stated that he was opposed to sitting on the robbery-murder case before him for the reason the death penalty was sought and that he could not be "fair to the State" in the case before him. He was then asked if he had a bias or prejudice in the proceeding, and replied "I am against capital punishment, yes." He was thereupon excused for cause. These final statements by Mr. Willis indicated merely a general opposition to the death penalty, and, as such, are not only clearly insufficient in themselves as a ground for his exclusion, according to the repeated holdings of this court,[2] but also are not inconsistent with his earlier statements that he

---

[2]Mr. Willis' statement that he was opposed to sitting on the case before him for the reason the death penalty was sought clearly does not meet the requirements of *Witherspoon*, since it "expressed little more than a deep uneasiness about participating in a death verdict." (*People* v. *Bradford*, 70 Cal.2d 333, 345 [74 Cal.Rptr. 726, 450 P.2d 46]; see also *People* v. *Stanworth*, 71 Cal.2d 820, 837-838 [80 Cal.Rptr. 49, 457 P.2d 889].)

As for Mr. Willis' statement that he could not be "fair to the State" in the case before him, we have held that a prospective juror's statement that he could not be fair or impartial to the state if selected to sit in the case cannot be the basis of a

could consider the death penalty in certain circumstances and therefore clearly cannot be construed as a retraction of those earlier statements.

In view of his expressed ability to consider the death penalty in the "proper case," Mr. Willis did not—as the majority argue—make it "unmistakably clear that under no circumstances would he impose the death penalty . . . ." Quite the contrary, his statements "clearly left open the possibility that in some case [he] might impose the death penalty" (*People* v. *Vaughn, supra,* 71 Cal.2d 406, 416), and therefore he was improperly excluded under *Witherspoon.* (See *id.,* at pp. 413-416; *Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 784, 88 S.Ct. 1770].)

The erroneous exclusion of Mr. Willis alone requires reversal of the penalty trial. (E.g., *People* v. *Washington,* 71 Cal.2d 1170, 1177 [81 Cal. Rptr. 5, 459 P.2d 259]; *In re Arguello,* 71 Cal.2d 13, 15-16 [76 Cal.Rptr. 633, 452 P.2d 921]; *People* v. *Bradford, supra,* 70 Cal.2d 333, 344-345; *In re Anderson, supra,* 69 Cal.2d 613, 619.)

challenge for cause according to *Witherspoon.* (*In re Seiterle,* 71 Cal.2d 698, 701 [78 Cal.Rptr. 857, 456 P.2d 129]; see also *In re Eli,* 71 Cal.2d 214, 216-217 [77 Cal.Rptr. 665, 454 P.2d 337]; *In re Anderson,* 69 Cal.2d 613, 617-618 [73 Cal.Rptr. 21, 447 P.2d 117].)

Finally, Mr. Willis' reply "I am against capital punishment, yes" to the question whether he had a bias or prejudice in the proceeding clearly does not warrant his exclusion under *Witherspoon.* It is well settled that substantively identical answers to substantively identical questions do not warrant exclusion under *Witherspoon.* In *In re Hill,* 71 Cal.2d 997, 1016, fn. 6 [80 Cal.Rptr. 537, 458 P.2d 449], this court held that it was error under *Witherspoon* to exclude for cause jurors who replied "I don't believe in the death penalty" to the question "[D]o you know of any reason why you cannot sit with us as a fair and impartial juror?" Similarly, in *In re Anderson, supra,* 69 Cal.2d 613, 617-618, we held improperly excluded under *Witherspoon* a juror who replied "Yes, sir, I do. I don't believe in capital punishment" to the question "Do you know of any reason you couldn't be a fair and impartial juror in this case?" (See also *People* v. *Schader,* 71 Cal.2d 761, 784-787 [80 Cal.Rptr. 1, 457 P.2d 841] [error to exclude juror who stated "that she was opposed to the death penalty and that her opinions on the death penalty would prejudice her"]; *People* v. *Quicke,* 71 Cal.2d 502, 508, fn. 1 [78 Cal.Rptr. 683, 455 P.2d 787] [error to exclude juror who stated "I am against capital punishment"].)

It is also apparent that Miss Rogers did not repudiate her expressed uncertainty toward the hypothetical case and ability to consider the death penalty in "the proper case." When asked by the prosecutor whether she would be willing to vote for a death verdict under any particular circumstances, she equivocally replied "I can't think of any circumstances now." Such a response falls far short of the unambiguous response demanded by *Witherspoon.* (See *People* v. *Vaughn, supra,* 71 Cal.2d 406, 413.) Moreover, when the hypothetical case was thereafter again posed to her she once again expressed uncertainty as to whether she could impose the death penalty in such a case, stating that "I don't know if I would or not. I really couldn't say."

Finally, the prosecutor asked each juror then present[3] whether he would be willing and have the courage to vote for a verdict of death "in this case" if he thought "this" was a proper case for the death penalty.[4] Miss Rogers

---

[3] Mr. Willis was not present at this time, having previously been excluded for cause.

[4] The *voir dire* examination by the prosecutor during this time was as follows (italics added):

"MR. BUGLIOSI [The Prosecutor]: Now, many jurors have no conscientious objection to the imposition of the death penalty, but they personally do not want to sit on a case where the death penalty is involved and vote for a verdict of death. I would like to ask of you an individual question, based essentially on what I just mentioned.

"Mr. Schmittdell, if you thought that under all the facts *in this case* and under all the circumstances that *this* was a proper case for the imposition of the death penalty, would you personally have the courage, and would you personally be willing to vote for a verdict of death?

"MR. SCHMITTDELL: Yes, I would.

"MR. BUGLIOSI: Now, before I go any further, I might make a statement that neither defendants' counsel or I, nor his Honor, can tell you what a proper case is for the imposition of a death penalty, for the simple reason there is no legal definition. The law leaves it up to your absolute discretion as to what is or is not a proper case. They don't give you any guidelines or standards to follow. It is up to your individual discretion whether you feel the facts are sufficiently aggravating to warrant the imposition of the death penalty. You all understand that?

"(Whereupon the prospective jurors indicated in the affirmative.)

"MR. BUGLIOSI: Mr. O'Connor, if you felt, after hearing all of the evidence and the testimony *in this case,* that *this* was a proper case for the imposition of the death penalty, would you personally be willing, and would you personally have the courage to vote for a verdict of death?

"MR. O'CONNOR: Provided they had been found guilty, and I believe that is in the next trial.

"Q Yes, before the issue of death even arises, *these defendants* have to be found guilty of first degree murder.

"A Right.

"Q And in a proper case, you say you would be willing and would have the courage to vote for a verdict of death, is that correct?

"A Yes.

"MR. BUGLIOSI: Mrs. O'Connor, how about you?

"MRS. O'CONNOR: Yes.

answered "No" to the question whether she would be willing and have the courage to vote for a verdict of death if she "thought that *this* was a proper case for the imposition of the death penalty, . . ." (Italics added.) The prosecutor then asked her, "Even if you thought *it* was a proper case, you would not have the courage to vote for a verdict of death?" (italics added), to which she replied, "No, I wouldn't." She was then excused by the court.

The word "it" in the latter question clearly refers to the words "this . . . case" in the prior question— so that both of Miss Rogers' answers indicated only her inability to return the death penalty in "this" case.

This court has held, in an opinion written by the author of the majority opinion in the instant case, that it is not sufficient grounds for exclusion under *Witherspoon* for a juror to indicate an inability to return the death penalty "in this case." (*People* v. *Risenhoover,* 70 Cal.2d 39, 55 [73 Cal. Rptr. 533, 447 P.2d 925].) Such an attitude does not necessarily preclude the juror "from concurring in such a verdict in all cases or in this case irrespective of the evidence that might be introduced at the trial," and thus it is "not . . . 'unmistakably clear' that [such a juror] 'would *automatically* vote against the imposition of capital punishment without regard to any

---

"Mr. Bugliosi: Mrs. Plumlee?

"Mrs. Plumlee: Yes.

"Mr. Bugliosi: Mrs. Blanchard?

"Mrs. Blanchard: Yes.

"Mr. Bugliosi: Mr. White?

"Mr. White: Yes, if so proved, yes.

"Mr. Bugliosi: The reason I am asking these individual questions, as I have indicated some jurors are not opposed to it but they want to let George do it. They, themselves, don't want to vote for a verdict of death.

"Mrs. Bowman, if you thought that *this* was a proper case for the imposition of the death penalty, would you personally be willing, and would you personally have the courage to vote for a verdict of death?

"Mrs. Bowman: Yes.

"Mr. Bugliosi: Mr. West, how about you, sir?

"Mr. West: Yes, sir.

"Mr. Bugliosi: Mr. Smith?

"Mr. Smith: Yes.

"Mr. Bugliosi: Miss Rogers?

"Miss Rogers: No.

"Q Even if you thought *it* was a proper case, you would not have the courage to vote for a verdict of death?

"A No, I wouldn't.

"Mr. Bugliosi: I make a motion, your Honor, to excuse the juror on the ground of implied bias.

"The Court: The motion is granted.

"Mr. Boags: [Defense Counsel]: Will the record reflect we are objecting?

"The Court: Objection is overruled."

evidence that might be developed at the trial. . . .' (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522, fn. 22 [20 L.Ed.2d 776, 785].)" (*People* v. *Risenhoover, supra,* 70 Cal.2d 39, 55.)

It should be noted that at the time Miss Rogers stated she would not impose the death penalty in "this" case, she knew only that the case before her involved a robbery and a killing during the commission of the robbery; she had not been informed that at the penalty trial evidence would be introduced as to prior armed robberies allegedly committed by the defendants. Since the introduction at trial of defendant's "priors" is an extremely important factor in a jury's decision to impose the death penalty (*A Study of the California Penalty Jury in First-Degree-Murder Case* (1969) 21 Stan.L.Rev. 1297, 1326-1327), it cannot even be said that Miss Rogers' responses indicate that she would not impose the death penalty in the particular case before her "irrespective of the evidence that might be introduced at the trial."[5]

---

[5]Even assuming the juror who states he would not return the death penalty "in this case" knows all of the relevant facts that are to be presented at the trial of the case before him so that his statement clearly indicates that he would not in fact impose the death penalty in the particular case before him, under *Risenhoover* he is improperly excluded because he has not indicated his automatic opposition to the death penalty "in all cases." (See also *People* v. *Vaughn, supra,* 71 Cal.2d 406, 416.)

Of course, the majority in the instant case do not purport to reject the *Risenhoover* ruling that a prospective juror is not properly excluded under *Witherspoon* because of his inability to impose the death penalty in the particular case before him, for to reject this ruling would be to emasculate completely *Witherspoon,* resulting often in juries that would "express the conscience of the community" even *less* than pre-*Witherspoon* "hanging juries."

The basic premise of *Witherspoon* is that "[g]uided by neither rule nor standard, 'free to select or reject as it [sees] fit,' a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death. Yet, in a nation less than half of ,whose people believe in the death penalty, a jury composed exclusively of such people cannot speak for the community. Culled of all who harbor doubts about the wisdom of capital punishment—of all who would be reluctant to pronounce the extreme penalty—such a jury can speak only for a distinct and dwindling minority." (391 U.S. at pp. 519-520 [20 L.Ed.2d at pp. 783-784]; footnotes omitted.)

An approach which would require the exclusion of prospective jurors based on their views as to the particular case would provide in effect that the less heinous the defendant's crime or the more exemplary his conduct prior to the crime, the greater the likelihood of securing a death-oriented jury. Under such an approach, the more favorable the circumstances for imposing life imprisonment in a given case, the more prospective jurors would state that they could not return the death penalty in that case, the less would be the resulting jury "express the conscience of the community," and the more "distinct and dwindling" the minority represented by the jury would become. And if a particular case involved such extremely mitigating circumstances that the overwhelming majority of citizens or prospective jurors would not consider

In summary, Miss Rogers stated to the defense attorney that whether she could impose the death penalty in "the proper case" "depends on the degree" and on "all the facts" and stated to both the defense attorney and the prosecutor that she did not know whether she would vote for the death penalty in the hypothetical situation. Her subsequent statements that she would not be willing to vote for the death penalty in "this" case after being informed that the case before her involved a robbery-murder clearly cannot be construed as a repudiation of her earlier expressions of ability to consider the death penalty in certain circumstances. In view of her expressed ability to consider the death penalty in certain circumstances, she did not—as the majority contend—make it "unmistakably clear that under no circumstances would she impose the death penalty, . . ." Like Mr. Willis, Miss Rogers "clearly left open the possibility that in some case [she] might impose the death penalty" (*People* v. *Vaughn, supra,* 71 Cal.2d 406, 416), and thus she was improperly excluded under *Witherspoon.*

The majority suggest an alternative ground for upholding the exclusion of Miss Rogers: "Although the instant trial preceded the decision in *Witherspoon,* the standards which the trial court imposed comported fully with those announced in *Witherspoon.* Therefore, we could base our decision as to Miss Rogers upon the rule that 'Where a prospective juror gives conflicting answers to questions relevant to his impartiality, the trial court's determination as to his state of mind is binding upon an appellate court. [Citations.]' (*People* v. *Linden,* 52 Cal.2d 1, 22 [338 P.2d 397].)"

First, whether the standards imposed by the trial court "comported fully

the death penalty after hearing all the relevant factors, the resulting jury would be even *more* of a "hanging jury" than that which *Witherspoon* proscribed.

Suppose, for example, that the prospective jurors in the instant case were informed not only that the case involved a murder committed in the course of a robbery, but also that one of the defendants—Milton—was not the triggerman. The fact that a defendant did not himself pull the trigger, but is being prosecuted for first degree murder as an accomplice or under the felony-murder doctrine, is extremely mitigating —such a defendant was very rarely given the death penalty by even the pre-*Witherspoon* "hanging juries" from which prospective jurors with general conscientious scruples were excluded for cause. (Compare, *In re Anderson, supra,* 69 Cal.2d 613, 618-619, with *A Study of the California Penalty Jury in First-Degree-Murder Cases, supra,* 21 Stan.L.Rev. 1297, 1348-1349.) Thus many "hanging jurors" that do not generally object to capital punishment apparently do object to its application to nontriggermen. If prospective jurors could be excluded for cause because the cases before them involve such nontriggermen and they state that they would never impose the death penalty against such defendants, the resulting juries would be culled not only of "all who harbor doubts about the wisdom of capital punishment" generally, but *also* of those who, though generally in favor of capital punishment, are opposed to its application in the vicarious liability situation. The resulting jury would be even *less* representative of the "conscience of the community" than the "hanging jury" that was proper under California law prior to *Witherspoon* and which *Witherspoon* attempted to preclude.

with those announced in *Witherspoon"* is the very point at issue, and for the reasons set forth at length above, I disagree with the majority on this point. It might be noted in this regard that, since the instant trial took place prior to the *Witherspoon* decision—when the state of the statutory and case law was materially different from the constitutional standard enunciated in *Witherspoon* and it was proper to excuse for cause prospective jurors who cannot be excluded under *Witherspoon* (*In re Anderson, supra,* 69 Cal.2d 613, 618-619)—it would be entirely fortuitous for the judge to have applied standards which were in accordance with *Witherspoon.* (*People* v. *Williams,* 71 Cal.2d 614, 629 [79 Cal.Rptr. 65, 456 P.2d 633].)

Moreover, it is doubtful that the rule quoted from *Linden,* if applied in the scrupled-juror situation, could ever "comport fully" with the *Witherspoon* holding that it must be "unmistakably clear" the excluded juror would automatically vote against the imposition of the death penalty. If the juror gives "conflicting answers" to the question as to whether he could ever impose the death penalty and the conflict is not subsequently resolved on *voir dire,* it simply cannot be said that his automatic opposition to the death penalty is "unmistakably clear."

For the above reasons, it is my opinion Miss Rogers also was improperly excluded in the present case.

Each of the erroneous exclusions—that of Mr. Willis and that of Miss Rogers—independently requires reversal of the penalty trial.

### ARANDA-BRUTON ERROR

*Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], held that a defendant's right of cross-examination is violated when he is inculpated by the introduction of an extrajudicial statement of a jointly tried codefendant in spite of an instruction that the jury consider the statement only against the codefendant. As the majority concede, *Bruton* must apply to statements introduced by a codefendant at the penalty phase of a capital trial. The majority also concede that *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], applies to statements introduced by a codefendant at a penalty trial, so that a trial judge faced with the likelihood that such a statement will be introduced must either grant a motion for separate penalty trials or see to it that all references to the nondeclarant defendant are "effectively deleted without prejudice to the declarant." (*Id.,* at p. 530.)

When Dr. Tweed took the stand, Floyd's counsel asked him to repeat

Floyd's version of the crime. Dr. Tweed's response mentioned the gun and Floyd's admission that he shot the bus driver. Floyd's counsel then initiated the following dialogue:

"Q Did he say where he had gotten the gun?

"A Yes, he said he had gotten the gun from some friend.

"Q Did he say where he was taking it?

"A He stated he was taking it to a relative of this friend from whom he had gotten the gun."

The jury was already aware from prior evidence that the gun was found in the home of Milton's half-brother, and the necessary implication of Dr. Tweed's testimony is that Milton had supplied Floyd with the murder weapon. The majority concede that Milton's *Aranda* rights were violated by the introduction of the portion of Dr. Tweed's testimony quoted above, and that "the jury conceivably could have inferred that Milton was the 'friend' who, according to Floyd, gave Floyd the gun, . . ." Nonetheless, the majority deem this error nonreversible because Milton's counsel failed to object to the offending questions and because the majority conclude any error was insubstantial (*People* v. *Hines,* 61 Cal.2d 164, 168-170 [37 Cal. Rptr. 622, 390 P.2d 398]) and harmless beyond reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Milton's counsel did not object to the questions of Dr. Tweed as to where Floyd obtained the gun or where he was taking it. Counsel did not move to strike the answers, but at the next recess out of the presence of the jury, he moved for a mistrial. The court denied the request, but ultimately instructed the jury "that the psychiatrist's testimony during this penalty trial 'which disclosed defendant's statements should be considered only for the purpose of exposing the information upon which the psychiatrist based his opinion and not as evidence of the truth of the statements.' "

The record shows that Milton's counsel did all that can reasonably be required to prevent this error and that under the settled principles relating to errors committed in the penalty trial, the error was reversible.

Immediately prior to the penalty trial, Milton's counsel raised the possibility that Dr. Tweed would testify as to a confession by Floyd which inculpated Milton. After extended discussion and some research, the trial judge denied Milton's request for a separate penalty trial while instructing Floyd's counsel to see to it that Dr. Tweed would not refer to Milton, and directing the prosecutor to avoid any such reference in cross-examination. When Milton's counsel suggested that it would be impossible effectively to

delete such references, the trial judge indicated that he would "meet this issue clearcut at the time I am confronted with it."

The failure to object to the specific questions asked of Dr. Tweed may not be held to constitute a waiver of the *Aranda* error. The court had expressly and without equivocation directed Floyd's counsel to admonish Dr. Tweed to delete all references to Milton. Thus, when Floyd's counsel asked the doctor did Floyd "say where he had gotten the gun?" Milton's counsel could reasonably have assumed that the court's instruction would be obeyed and that the response would not refer to Milton. In fact, such an assumption would have been correct; Dr. Tweed replied simply that Floyd received the gun from "some friend." Similarly, when Dr. Tweed was asked whether Floyd said "where he was taking" the gun, Milton's counsel could again reasonably have assumed that the court's instruction would be obeyed and that the response would not refer to Milton. For example, counsel could have assumed that Dr. Tweed, who was not purporting to quote Floyd, would have answered that Floyd was taking the gun to another friend. Hence, prior to Dr. Tweed's second response, Milton's counsel was fully justified in relying upon the court's instruction and in foregoing the tactical risks of objecting. In fact, however, Dr. Tweed's second response—that Floyd "was taking [the gun] to a relative of this friend from whom he had gotten the gun"—connected this dialogue with Milton because the jury already knew the gun was found in the home of Milton's half-brother. Even though pretrial discussion left open the possibility that the court would have to resolve problems posed by unavoidable references to Milton when they arose, there is nothing in the record suggesting that this reference to Milton was unavoidable. Hence Milton's counsel cannot be expected to have anticipated the reference.

To hold, as the majority do, that failure to object should preclude Milton from raising the *Aranda* error would mean that Milton's counsel, in order to protect his client's rights, would have had to object to every question of Dr. Tweed where there was any possibility of reference to Milton. In view of the court's order to delete all reference to Milton, it is manifestly unfair to place such a burden upon Milton's counsel.[6] Such a requirement would be purely formalistic and serve no useful purpose.

---

[6] I find untenable the majority's suggestion that Milton's counsel should have objected on the ground that the questions relating to where Floyd obtained the gun and where he was taking it were irrelevant. Dr. Tweed was called to testify as to Floyd's susceptibility to rehabilitation. Dr. Tweed testified that the killing was neither premeditated nor deliberate, but was instead "sort of automatic." Dr. Tweed's account of the story he heard from Floyd implied that Floyd's possession of the gun was temporary. Such testimony is clearly relevant for purposes of disclosing the basis of Dr. Tweed's expert opinion, and the fact that Floyd told Dr. Tweed where he got. and where he was taking the gun would tend to support Dr. Tweed's conclusion that

The majority do not claim that the failure to move to strike Dr. Tweed's testimony constituted a waiver by Milton of his right to confrontation, and it would be improper to so hold. A motion to strike the answers was not necessary to alert the trial judge and other counsel to Milton's right to have all references to him excluded or to his assertion of that right. He had previously asserted the right and the judge had seemingly vindicated it by his order directing deletion of all such references. More importantly, the granting of a motion to strike or a limiting instruction, as recognized by *Aranda* and *Bruton,* would not have eliminated the harmful results of the error, and therefore the requirement of a motion to strike is not applicable. (*People* v. *Varnum,* 70 Cal.2d 480, 488 [75 Cal.Rptr. 161, 450 P.2d 553].)

Critical to both *Aranda* and *Bruton* is the recognition that "the erroneous admission into evidence of a confession implicating both defendants is not necessarily cured by an instruction that it is to be considered only against the declarant." (*Bruton* v. *United States, supra,* 391 U.S. at p. 133, fn. 9 [20 L.Ed.2d at p. 483], quoting *People* v. *Aranda, supra,* 63 Cal.2d at p. 526.) It was precisely because of the inherent inefficacy of such an instruction when the jury has already heard a confession implicating a nondeclarant defendant that *Aranda* established the alternatives of separate trials or effective deletions of all references to the nondeclarant. (*People* v. *Aranda, supra,* 63 Cal.2d at pp. 528-531.) And, "[b]y effective deletions, we mean not only direct and indirect identifications of codefendants but any statements that could be employed against nondeclarant codefendants once their identity is otherwise established." (*Id.,* at p. 530; footnote omitted.)

Here the deletions were ineffective. The evidence that the murder weapon was found in the home of Milton's half-brother was an important part of the prosecution's case at the guilt trial and undoubtedly made an indelible impression upon the jury. When coupled with this evidence, Dr. Tweed's repetition of Floyd's statement clearly implied Milton had supplied the gun to Floyd. As soon as the questions were asked, Milton's counsel was put in the very dilemma *Aranda* sought to prevent. An objection or motion to strike would only have served to crystallize the damaging implications of

---

Floyd was telling him the truth. Thus, had Milton's counsel objected that the questions were irrelevant, the objection would probably have been overruled. Moreover, all of Dr. Tweed's testimony should have been irrelevant to Milton, as the trial judge had ordered. Absent a question calling unavoidably for reference to Milton, Milton's counsel was justified in relying upon the judge's order, and in leaving tactical decisions regarding relevancy to Floyd's counsel—who had called Dr. Tweed solely for his own client's case. Finally, since Milton's counsel cannot be deemed to have waived the *Aranda* claim by failing to object at all, a fortiori no waiver can follow from his failure to object on non-*Aranda* grounds.

Dr. Tweed's testimony, and a limiting instruction might also have done more harm than good. In my view, it is absurd to condition the raising of an error upon an objection when the whole theory of the violated rule is premised upon the inefficacy of objection.

The majority's application of harmless error rules is as unsatisfactory as their invocation of the requirement of objection. The majority seek to depress the prejudicial effect of Dr. Tweed's implication that Milton gave Floyd the murder weapon by pointing to Milton's prior armed robberies, two of which were committed with Floyd. Although nothing has altered our ignorance as to just what factors prompt a particular jury to return a death verdict in any given case, we now have empirical evidence that certain factors *generally* have a significant impact on the penalty verdicts of California juries. (*A Study of the California Penalty Jury in First-Degree-Murder Cases, supra,* 21 Stan.L.Rev. 1297, 1420.) This study supports the majority's implication that the introduction of a defendant's criminal record significantly increases the likelihood that a death verdict will be returned against him. (*Id.,* at pp. 1326-1330.) On the other hand, the circumstance that a defendant did not personally kill a victim strongly reduces the likelihood that a death penalty will be returned; in fact, only 4 of the 52 defendants included within the study's sample of 238 penalty trials who did not personally commit an act of homicide were condemned to death by a penalty jury. (*Id.,* at pp. 1348-1349.) More important for the case before us, the study found a significant relationship between a defendant's status as a "non-triggerman" and life sentence verdicts *after eliminating the effects of other factors—including the introduction of prior offenses.* (Compare *id.,* at pp. 1348-1349 with *id.,* at pp. 1316-1326.) In other words, the fact that a defendant is a "non-triggerman" *by itself* significantly increases his chance of obtaining a life verdict, even assuming that his "priors" are introduced at the penalty trial.

In sum, Dr. Tweed's testimony furnished the sole basis for an inference that Milton supplied Floyd with the murder weapon. Since it is impossible for us to know whether this inference affected the decision of the particular jury which condemned Milton to die, and since this inference tends to negate Milton's status as "non-triggerman"—a status which generally weighs heavily in favor of a life sentence regardless of a prior record—this court is in no position to declare that the conceded *Aranda* error did not contribute to Milton's death verdict. If Floyd's admissions were believed, it is not at all unlikely that any tendency of the jury to distinguish for purposes of punishment between Floyd and Milton was neutralized by the showing that Milton was at least equally involved in the use of the gun in the robbery.

Although the majority concede *Aranda* error, their discussion of *Bruton*

leaves me uncertain whether they have concluded that there was harmless error or that there was no *Bruton* error. In my view there was such error, and it was prejudicial.

In concluding that any *Bruton* error was not prejudicial, the majority deny that Dr. Tweed's testimony created a substantial risk that the jury would ignore the court's instruction. In so doing the majority have intertwined the incidents of *Bruton* error with rules designed to determine whether a conceded error is reversible because prejudicial.

I think a fair reading of the *Bruton* language cited by the majority[7] indicates *Bruton* was concerned not with the question of harmless error,

---

[7]The majority's citation is to the first of the following two concluding paragraphs of *Bruton:* "Finally, the reason advanced by the majority in *Delli Paoli* was to tie the result to maintenance of the jury system. 'Unless we proceed on the basis that the jury will follow the court's instructions where those instructions are clear and the circumstances are such that the jury can reasonably be expected to follow them, the jury system makes little sense.' 352 U.S. at 242 [1 L.Ed.2d at 285]. We agree that there are many circumstances in which this reliance is justified. Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. 'A defendant is entitled to a fair trial but not a perfect one.' . . . It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information. Nevertheless, as was recognized in *Jackson* v. *Denno, supra, there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. . . . Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed. Pointer* v. *Texas, supra.*

"We, of course, acknowledge the impossibility of determining whether in fact the jury did or did not ignore Evans' statement inculpating petitioner as to petitioner's guilt. But that was also true in the analogous situation in *Jackson* v. *Denno,* and was not regarded as militating against striking down the New York procedure there involved. It was enough that that procedure posed 'substantial threats to a defendant's constitutional rights to have an involuntary confession entirely disregarded and to have the coercion issue fairly and reliably determined. These hazards we cannot ignore.' 378 U.S. at 389 [12 L.Ed.2d at 922, 1 A.L.R.3d 1205]. Here the introduction of Evans' confession posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. *Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.* . . . (*Bruton* v. *United States, supra,* 391 U.S. 123, 135-137 [20 L.Ed.2d 476, 484-485, 88 S.Ct. 1620]; italics added, footnotes omitted.)

but rather with defining a *context* in which a limiting instruction cannot cure error. The court's conclusion was that because extrajudicial statements of a codefendant which inculpate a nondeclarant defendant are inherently "powerfully incriminating," the introduction of such statements when the declarant does not take the stand presents a context "in which the risk that the jury will not, or cannot, follow instructions is . . . great," and that therefore "in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination." (*Bruton* v. *United States, supra,* 391 U.S. at pp. 135-137 [20 L.Ed.2d at pp. 484-485].)

Thus *Bruton* deems erroneous the mere context presented by the introduction of a statement by a codefendant who does not testify when that statement inculpates a jointly tried nondeclarant defendant. The court's discussion of the incriminating nature of such statements and of the risk that a jury will ignore a limiting instruction explains the rule, but does not establish factual prerequisites to a finding that the rule has been violated.

Even if findings of incrimination and of risk are prerequisite to establishing *Bruton* error, however, it is perfectly clear that these findings do not determine the question whether an error—like the one here—is reversible. *Bruton* acknowledged "the impossibility of determining whether in fact the jury did or did not ignore" a limiting instruction. (*Id.,* at p. 136 [20 L.Ed.2d at p. 485].) Thus, once both incrimination and risk are established, it must be assumed the jury did not follow the instruction: "The effect is the same as if there had been no instruction at all." (*Id.,* at p. 137 [20 L.Ed.2d at p. 485].)

Here, incrimination is established by Dr. Tweed's testimony, which furnished the sole basis for the inference that Milton supplied the murder weapon. The risk that the jury improperly used that testimony against Milton is even greater than in *Bruton*. In *Bruton,* the jury was clearly instructed not to consider the codefendant's confession as evidence against the nondeclarant. (*Id.,* at pp. 125, fn. 2, 137 [20 L.Ed.2d at pp. 479, 485].) Here the jury was never given a clear and unambiguous instruction that it could not use Dr. Tweed's testimony concerning Floyd's statements against Milton. Instead, the jury was told it could consider those statements " 'only for the purpose of exposing the information upon which [Dr. Tweed] based his opinion and not as evidence of the truth of the statements.' " The jury might have adhered to the literal meaning of this instruction by considering the evidence that the gun was found in the apartment of Milton's half-brother as proof of "the truth of the statements" which were exposed by Dr. Tweed—and by considering the resulting inference that Milton supplied the murder weapon as evidence in aggravation of the penalty.

Hence the fact of *Bruton* error as to Milton seems clear. But the critical question remains whether that error was reversible. (E.g., *In re Hill, supra,* 71 Cal.2d 997, 1013-1015.) It cannot be disputed that *Bruton* was a constitutional decision, or that a conviction must not be sustained in the face of constitutional error unless an appellate court can declare that it is convinced beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman* v. *California, supra,* 386 U.S. at p. 24 [17 L.Ed.2d at p. 710].)

The California harmless error rule for all penalty trial errors is stated by *People* v. *Hines, supra,* 61 Cal.2d 164. In that case, we examined the unique aspects of penalty trials which render inapposite the "reasonably probable" harmless error rule which is applicable to guilt errors. Because of the absolute discretion afforded a jury presented with "a mass of material," because "[t]he precise point which prompts the penalty in the mind of any one juror is not known to us and may not even be known to him," and because " '[t]o attempt to assess the effect of error in this legal vacuum is to superimpose one untestable surmise upon another,' " we reaffirmed the rule that " 'any substantial error occurring during the penalty phase of the trial, that results in the death penalty, since it reasonably may have swayed a juror, must be deemed to have been prejudicial.' " (*Id.,* at pp. 168-170, and cases cited.)

My view of the relationship between the *Hines* and *Chapman* tests in the context of a penalty trial constitutional error is that they are perfectly consistent: it is impossible to declare beyond reasonable doubt that any substantial error did not contribute to a death verdict. In any case, we are bound by the supremacy clause to apply the *Chapman* test here, and to reverse the penalty verdict unless we can say beyond a reasonable doubt that the implications of Dr. Tweed's testimony did not contribute to Milton's death verdict. I submit such a declaration would fly in the face of reality—especially in view of the factors discussed at length in *Hines.* Accordingly, I would reverse Milton's penalty verdict because of prejudicial *Bruton* error in the penalty trial below.

## Misconduct

It is clear the prosecutor argued that the jury should impose the death penalty to exact retribution. The majority note that we have never addressed the question of the propriety of such argument in a penalty trial, that we have held "in other contexts" that vengeance or retribution has no place in " 'the scheme' " (*In re Estrada,* 63 Cal.2d 740, 745 [48 Cal.Rptr. 172, 408 P.2d 948]), that we have expressed doubts as to the

propriety of introducing a photograph displaying a murder victim's pain because "retribution is no longer considered the *primary* objective of the criminal law" which "focuses on the criminal, not *merely* on the crime" (*People* v. *Love,* 53 Cal.2d 843, 856-857, fn. 3 [3 Cal.Rptr. 665, 350 P.2d 705]; italics added), and that the prosecutor argued other factors besides retribution in appellants' penalty trial. From this the majority conclude: "In these circumstances, the prosecutor's remarks concerning the widow of the slain bus driver did not constitute misconduct. (See *People* v. *Garner,* 57 Cal.2d 135, 156 [18 Cal.Rptr. 40, 367 P.2d 680]; *People* v. *Love,* 56 Cal.2d 720, 731 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809].)"

I believe the prosecutor's retribution argument was clearly misconduct. *In re Estrada, supra,* 63 Cal.2d 740, culminated in California a trend reflected in the opinions of a variety of state and federal courts which have indicated a growing disapproval of retribution as a penal objective. (E.g., *Williams* v. *New York* (1949) 337 U.S. 241, 248 [93 L.Ed. 1337, 1342, 69 S.Ct. 1079]; *Ronan* v. *Stevens* (1963) 93 Ariz. 375 [381 P.2d 100, 102-103]; *People* v. *Love, supra,* 53 Cal.2d 843, 856-857, fn. 3; *Tuel* v. *Gladden* (1963) 234 Ore. 1 [379 P.2d 553, 554-556].)

Perhaps this trend was most eloquently described closer to its inception: "Historically, it may be said that the origin of all legal punishments had its root in the natural impulse of revenge. At first this instinct was gratified by retaliatory measures on the part of the individual who suffered by the crime committed, or, in the case of murder, by his relatives. Later, the state took away the right of retaliation from individuals, and its own assumption of the function of revenge really constituted the beginning of criminal law. The entire course, however, of the refinement and humanizing of society has been in the direction of dispelling from penology any such theory." (*Commonwealth* v. *Ritter* (Phila. Co. 1930) 13 Pa.D. & C. 285, 290.)

*Estrada* altered the previous California position that penalty-ameliorating amendments apply only to crimes committed after the effective date of the amendment. In holding that such amendments apply to all cases not yet final, we stated: "This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*In re Estrada, supra,* 63 Cal.2d at p. 745.)

*Estrada* continued by quoting with approval *People* v. *Oliver* (1956) 1 N.Y.2d 152, [151 N.Y.S.2d 367, 134 N.E.2d 197, 201-202], a case which reached a similar result on the same theory: "This application of statutes reducing punishment accords with the best modern theories

concerning the functions of punishment in criminal law. According to these theories, the punishment or treatment of criminal offenders is directed toward one or more of three ends: (1) to discourage and act as a deterrent upon future criminal activity, (2) to confine the offender so that he may not harm society and (3) to correct and rehabilitate the offender. There is no place in the scheme for punishment for its own sake, the product simply of vengeance or retribution."

Although *Estrada* arose in "other contexts" than review of a death penalty trial, it is clear that "the scheme" with which *Estrada* was concerned was the whole of criminal law and penology. And the "context" was not that far removed from a death penalty case: *Estrada* expressly overruled *People v. Harmon,* 54 Cal.2d 9 [4 Cal.Rptr. 161, 351 P.2d 329]. (*In re Estrada, supra,* 63 Cal.2d at p. 742.) Harmon was convicted of nonfatal assault by a life prisoner at a time when such a conviction carried a mandatory death penalty. We rejected Harmon's suggestion that we follow the rule of *People v. Oliver, supra,* to apply an amendment which was enacted prior to his appeal and which provided a discretionary death penalty for such an assault. (*People v. Harmon, supra,* 54 Cal.2d at pp. 20-27.) Harmon was executed on August 9, 1960.

None of the cases cited by the majority indicate any regression from *Estrada's* recognition that retribution has no legitimate place in the criminal law. In *People v. Love, supra,* 53 Cal.2d 843, the appellant challenged the admission into evidence of a tape recording and photograph of a murder victim prior to and at death, respectively. Finding this evidence tended to prove only that the victim died in unusual pain, we held its introduction prejudicially erroneous when compounded by the prosecutor's argument to the same effect. We noted in passing that proof of unintentionally inflicted pain is of "questionable importance to the selection of penalty" because relevant only to retribution, and because "retribution is no longer considered the primary objective of the criminal law . . . and is thought by many not even to be a proper consideration . . . ." (*Id.,* at pp. 856-857, & fn. 3, citations omitted.) *Love* was a part of the trend which *Estrada* culminated; it foreshadowed *Estrada's* recognition that retribution has no place in modern penology. For this court to cite *Love* to limit *Estrada* would be to announce an egregious retreat from the "evolving standards of decency that mark the progress of a maturing society." (*Trop v. Dulles* (1958) 356 U.S. 86, 101 [2 L.Ed.2d 630, 642, 78 S.Ct. 590].)

Moreover, the rationale of *People v. Love, supra,* fully supports the conclusion that retributive argument at a penalty trial is misconduct. With regard to the challenged evidence, and in view of other evidence of the victim's pain, we reasoned that "even if relevant and material, . . . the

photograph and the tape recording served primarily to inflame the passions of the jurors and both should have been excluded." (*People* v. *Love; supra,* 53 Cal.2d at pp. 856-857.) Denying that the wide scope of the penalty trial justifies the admission of such evidence, we explained: "Allegedly inflammatory evidence is admissible only when its probative value outweighs its prejudicial effect. . . . Since the jury has complete discretion to choose between the alternative penalties *in the light of the objectives of criminal law* . . . the permissible range of inquiry on the issue of penalty is necessarily broad. . . . The determination of penalty, however, like the determination of guilt, must be a rational decision. Evidence that serves primarily to inflame the passions of the jurors must therefore be excluded, and to insure that it is, the probative value and the inflammatory effect of proffered evidence must be carefully weighed." (*Id.,* at p. 856; citations omitted, italics added.) Since the jury's task is to choose the appropriate penalty "in the light of the objectives of criminal law," and since *Estrada* flatly denies that retribution is such an objective, it follows that evidence and argument relevant only to retribution is erroneous and should be excluded from penalty trials. Furthermore, such argument inherently "serves primarily to inflame the passions of the jurors," and for that reason alone must be excluded.

To whatever extent retributive argument might amount to a dispassionate appeal for execution as a means of preventing extralegal vengeance or of maintaining community respect for the administration of justice,[8] another of the authorities relied upon by the majority provides ample reasons for the exclusion of such argument. *People* v. *Love, supra,* 56 Cal.2d 720, held that evidence and argument as to the deterrent effect of capital punishment are improper because argument must be based on properly admitted evidence or matters of common knowledge, because there is "no legislative finding, and it is not a matter of common knowledge, that capital punishment is or is not a more effective deterrent than imprisonment," because argument may not be calculated to mislead the jury or appeal primarily to passion, and, inferentially, because "[j]uries in capital cases cannot become legislatures *ad hoc,* and trials on the issue of penalty cannot be converted into legislative hearings." (*Id.,* at pp. 729-732, 726.) I submit that all of these reasons apply as forcefully to retribution as to deterrence. *Estrada* held that concluding that the Legislature was motivated by vengeance would be impermissible "in view of modern theories of penology." (*In re Estrada, supra,* 63 Cal.2d at p. 745.) Whether or not the imposition of capital punishment serves to prevent extralegal vengeance

---

[8]It is noteworthy that we have held that in a penalty trial, "[a] warning of probable consequences of failure to convict, and of the unfavorable reactions of neighbors is improper . . . ." (*People* v. *Purvis,* 60 Cal.2d 323, 342 [33 Cal.Rptr. 104, 384 P.2d 424].)

or to maintain community respect for the administration of criminal justice are certainly not matters of common knowledge. To the extent that retributive argument urges these propositions, a fair resolution of the factual propriety of such propositions in any given penalty trial would require presentation of such a wide range of evidence and argument that penalty trials might indeed resemble legislative hearings. To every other extent, retributive argument appeals solely to passion.

Hence I believe it settled that retribution has no place in the criminal law or in proceedings to determine penalty. I think it indisputable that this court would not even consider qualifying these principles but for the existence of capital punishment, and the existence of capital punishment is obviously not a judicially cognizable reason for doing so now. I am not sure that the majority do intend to retreat from *Estrada*, but because they have cited language which might be so viewed, I find it necessary to express my views.

*People* v. *Love, supra,* 56 Cal.2d at p. 731, discussed the prosecutor's erroneous deterrence argument in the context of prior cases. Although the language cited by the majority might be taken to approve argument "that it is necessary swiftly and severely to punish the guilty," this hardly amounts to approval of retributive argument—because swift and severe punishment may be suggested by legitimate penal objectives. It follows that the implied necessity of showing that a "prosecutor went beyond merely urging severe punishment" does not support a conclusion that merely urging retributive punishment is nonprejudicial.

The majority's remaining authority is *People* v. *Garner, supra,* 57 Cal.2d 135, 156, which held that concededly erroneous argument concerning deterrence was nonprejudicial because "only a minor part of [the prosecutor's] appeal to the jury . . . ."

Although the prosecutor's references to retribution were few quantitatively, I believe the context of those references rendered them a substantial portion of his appeal for execution. Apart from several sentences commending the jurors for their conscientiousness, thanking them for their attention, and expressing confidence that their verdict would be just, the prosecutor's references to retribution constituted the conclusion of his entire argument.[9] Although his tone of voice is impossible to glean from

---

[9]The whole of the prosecutor's conclusion was as follows:

"Is life imprisonment the proper penalty for these two defendants? I think it is common knowledge that our society is becoming more and more permissive. Whether for good or bad, certainly I don't know. I am not a sociologist and don't purport to be. But I don't think we have reached the point yet where equal punishment for our

the record, his language obviously reflects an appeal to the passions of the jurors. He argued that although "our society is becoming more and more permissive. . . . I don't think we have reached the point yet where equal punishment for our crimes can only take place in the second life and not in this life," that "[t]hese defendants snuffed the life of a precious human being," that "[w]e are not only talking about avenging Mr. Hartzel's death, but Mrs. Hartzel," and that the defendants should not be permitted to live in prison when "Mr. Hartzel would never eat another meal, never see his wife again, never listen to music again, never see another sunrise."

As noted above, the appropriate test of harmless error in a penalty trial examines whether the error was substantial.[10] Because the prosecutor's

---

crimes can only take place in the second life and not in this life. I don't think they have gotten that permissive yet.

"So I think you should ask yourselves this question. These defendants snuffed the life of a precious human being, or the precious life of a fellow human being, a 71-year-old bus driver. You recall Mrs. Hartzel testified, I believe, he had been a bus driver for 48 years. I think it is a fair inference he was probably a hard worker, probably was about to retire, spend the few remaining years of his life, the twilight of his life, enjoying a few warm, pleasant years with his family. These guys killed him.

"The question is what would be equal punishment for that act. We are not only talking about avenging Mr. Hartzel's death, but Mrs. Hartzel. A great, great, an enormous loss. Sometimes it is too easy to forget about the victim and his loved ones.

"Counsel, by innuendo, have told you how horrible it is—they don't come out and say it, but the gas chamber and stuff like that. Well, there is another side of that coin. Maybe life imprisonment isn't that bad, either.

"I know they are fed. I imagine three meals a day. I imagine their living conditions are sanitary. I know, at least in the State Prisons in California, they have a library. They have a movie. The inmates participate in sports. Oh, it is not a country club. Don't get me wrong. I am not saying that at all. It is not that bad, either.

"Should these defendants be permitted to live like that, we should say that Mr. Hartzel would never eat another meal, never see his wife again, never listen to music again, never see another sunrise. That is the problem you are going to have to deal with.

"Do they deserve to be given a break? I don't know. Did they give Mr. Hartzel a break? Do they deserve to be given another chance? Did they give Mr. Hartzel a chance? Do they deserve any mercy? Did they show any mercy for Mr. Hartzel?

"I would say that it is an easy way out for you folks, the easiest thing for you to do would be to go back in the jury room and come back with a verdict for life imprisonment. That would be very easy, but the question is, is it the right way? Is it the way of 12 responsible human beings?

"You all told me that you would have the courage in the proper case to come back with a verdict of death. Now, all the chips are on the line, and I say that if this is not a proper case for the death penalty, what would be a proper case? How aggravated does a killing have to be? If the death penalty is to mean anything in the State of California other than two empty words, this is a proper case.

"In any event, you are 12 reasonable men and women. I know you are very conscientious. All of you were taking notes throughout the entire trial, I am confident whatever verdict you reach will be a proper and a fair verdict under the circumstances.

"I want to thank you very much for your attention throughout the entire trial. Thank you."

[10]Because I believe this test is the equivalent of the "reasonable doubt" standard of harmless constitutional error when an error occurs in a penalty trial, it is unneces-

references to retribution amounted to a passionate concluding appeal for death sentences, I do not see how they can be deemed insubstantial and therefore harmless.

In sum, I would reverse both penalties because of *Witherspoon* error. I believe the improper admission of Floyd's statement through Dr. Tweed independently calls for a reversal of Milton's death verdict. Finally, I disagree with the majority's treatment of the misconduct contention to the extent that it implies either that retributive argument is proper or that the erroneous argument in this case was harmless.

Traynor, C. J., and Tobriner, J., concurred.

Appellants' petitions for a rehearing were denied February 25, 1970. Peters, J., was of the opinion that the petitions should be granted.

---

sary to determine whether *Estrada's* absolute rejection of retribution is compelled by the Eighth Amendment. (See, *The Death Penalty Cases* (1968) 56 Cal.L.Rev. 1268, 1343-1354.)